**James E. SWANN et al., Plaintiffs,**

v.

**The CHARLOTTE–MECKLENBURG
BOARD OF EDUCATION,
Defendant.**

**Civ. A. No. 1974.**

United States District Court
W. D. North Carolina,
Charlotte Division.

April 23, 1969.

See also 4 Cir., 369 F.2d 29.

½

Conrad O. Pearson, Durham, N. C., J. LeVonne Chambers, James E. Ferguson, II, and James E. Lanning, Charlotte,

N. C., and Jack Greenberg, James M. Nabritt, III, and Robert Belton, New York City, for plaintiffs.

Brock Barkley, Charlotte, N. C., and William J. Waggoner, Charlotte, N. C., for defendant.

### OPINION AND ORDER REGARDING DESEGREGATION OF SCHOOLS OF CHARLOTTE AND MECKLENBURG COUNTY, NORTH CAROLINA

McMILLAN, District Judge.

#### PRELIMINARY SUMMARY

The case, originally filed in 1965, is now before the court under the "MOTION FOR FURTHER RELIEF" filed by the plaintiffs on September 6, 1968. The motion seeks greater speed in desegregation of the Charlotte-Mecklenburg schools, and requests elimination of certain other alleged racial inequalities. Evidence was taken at length on March 10, 11, 12, 13, 17 and 26, 1969. The file and the exhibits are about two and one-half feet thick, and have required considerable study. In brief, the results of that study are as follows:

The Charlotte-Mecklenburg schools are not yet desegregated. Approximately 14,000 of the 24,000 Negro students still attend schools that are all black, or very nearly all black, and most of the 24,000 have no white teachers. As a group Negro students score quite low on school achievement tests (the most objective method now in use for measuring educational progress); and the results are not improving under present conditions. The system of assigning pupils by "neighborhoods," with "freedom of choice" for both pupils and faculty, superimposed on an urban population pattern where Negro residents have become concentrated almost entirely in one quadrant of a city of 270,000, is racially discriminatory. This discrimination discourages initiative and makes quality education impossible. The quality of public education should not depend on the economic or racial accident of the neighborhood in which a child's parents have chosen to live—or find they must live—nor on the color of his skin. The neighborhood school concept never *prevented* statutory racial segregation; it may not now be validly used to *perpetuate* segregation.

Since this case was last before this court in 1965, the law (or at least the understanding of the law) has changed. School boards are now clearly charged with the affirmative duty to desegregate schools *"now"* by positive measures. The Board is directed to submit by May 15, 1969 a positive plan for faculty desegregation effective in the fall of 1969, and a plan for effective desegregation of pupil population, to be predominantly effective in the fall of 1969 and to be completed by the fall of 1970. Such plan should try to avoid any re-zoning which tends to perpetuate segregated pupil assignment. The Board is free to consider all known ways of desegregation, including bussing (the economics of which might pleasantly surprise the taxpayers); pairing of grades or of schools; enlargement and re-alignment of existing zones; freedom of transfer coupled with free transportation for those who elect to abandon *de facto* segregated schools; and any other methods calculated to establish education as a public program operated according to its own independent standards, and unhampered and uncontrolled by the race of the faculty or pupils or the temporary housing patterns of the community.

#### THE LAW WHICH GOVERNS

This case vitally affects 83,000 school children of Charlotte and Mecklenburg County—and their families. That means virtually all of us. The School Board and this court are bound by the Constitution as the Supreme Court interprets it. In order that we think in terms of law and human rights instead of in terms of personal likes and preferences, we ought to read what the Supreme Court has said.

Before 1954, public education in North Carolina was segregated by law. "Sep-

arate but equal" education was acceptable. This *de jure* segregation was outlawed by the two decisions of the Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). ,

The first *Brown* opinion held that racial segregation of schools by law was unconstitutional because racial segregation, even though the physical facilities and other tangible factors might be equal, deprives Negro children of equal educational opportunities. The Court recalled prior decisions that segregation of graduate students was unlawful because it restricted the student's "ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession." The Court said:

"Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."

Quoting a lower court opinion, the Supreme Court continued:

" 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.'

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. * * *."

The second *Brown* case, decided May 31, 1955, directed school boards to do whatever was necessary to carry out the Court's directive as to the pending cases "with all deliberate speed" (349 U.S. 301, 75 S.Ct. 753).

North Carolina's most significant early response to *Brown* was the Pupil Assignment Act of 1955–56,[1] under which local school boards have the sole power to assign pupils to schools, and children are required to attend the schools to which they are assigned.

 *It is still to this day the local School Board, and not the court, which has the duty to assign pupils and operate the schools, subject to the requirements of the Constitution.* It is the court's duty to assess any pupil assignment plan in terms of the Constitutio. , which is still the supreme law of the la. l.

---

1. N.C.G.S. § 115–176. Authority to provide for assignment and enrollment of pupils; rules and regulations.—Each county and city board of education is hereby authorized and directed to provide for the assignment to a public school of each child residing within the administrative unit who is qualified under the laws of this State for admission to a public school. Except as otherwise provided in this article, *the authority of each board of education in the matter of assignment of education to the public schools shall be full and complete*, and its decision as to the assignment of any child to any school shall be final. * * *

No child shall be enrolled in or permitted to attend any public school other than the public school to which the child has been assigned by the appropriate board of education. In exercising the authority conferred by this section, each county and city board of education shall make assignments of pupils to public schools so as to provide for the *orderly and efficient administration* of the public schools, and *provide for the effective instruction*, health, safety, and general welfare of the pupils. Each board of education may adopt such reasonable rules and regulations as in the opinion of the board are necessary in the administration of this article. (Emphasis added.)

Some token desegregation of Charlotte city schools occurred during the late 1950's. In 1961, upon economic and administrative grounds not connected with questions of segregation, the Charlotte City schools and the Mecklenburg County schools were consolidated into one school administrative unit under one nine-member board known as the Charlotte-Mecklenburg Board of Education. By 1964 a few dozen out of more than 20,000 Negro school children were attending schools with white pupils.

This suit was filed on January 19, 1965, by Negro patrons, to seek orders expediting desegregation of the schools. At that time, serious questions existed whether *Brown* required any positive action by school boards to eliminate segregated schools or whether it simply forbade active discrimination. An order was entered in 1965 by the then District Judge in line with the law as then understood, substantially approving the Board's plan for desegregation, 243 F. Supp. 667. The Fourth Circuit Court of Appeals affirmed the order, 369 F.2d 29.

Pursuant to the approved plan the Board closed certain all-Negro schools, established school zones, built some new schools, and set up a freedom of choice arrangement for the entire system. The students in a zone surrounding each school are assigned to that school; a period is allotted each spring to request assignment to another school; no reason for transfer need be given; all transfer requests are honored unless the requested schools are full; no transportation is available to implement such transfer.

In appraising the results under this plan in 1969, four years later, we must be guided by some other and more recent things the Supreme Court has said.

In Green v. New Kent County School Board, 391 U.S. 430 at 435, 88 S.Ct. 1689 at 1693, 20 L.Ed.2d 716 (1968), the Supreme Court held unlawful a county school pupil assignment system which maintained a black school and a white school for the same grades. The Court said:

"It was such dual systems that 14 years ago *Brown I* held unconstitutional and a year later *Brown II* held must be abolished; school boards operating such school systems were *required* by *Brown II* 'to effectuate a transition to a racially nondiscriminatory school system.' 349 U.S., at 301 [75 S.Ct. at 756]. It is of course true that for the time immediately after *Brown II* the concern was with making an initial break in a long-established pattern of excluding Negro children from schools attended by white children. The principal focus was on obtaining for those Negro children courageous enough to break with tradition a place in the 'white' schools. See, e. g., Cooper v. Aaron, 358 U.S. 1 [78 S.Ct. 1401, 3 L.Ed.2d 5]. Under *Brown II* that immediate goal was only the first step, however. *The transition to a unitary, nonracial system of public education was and is the ultimate end to be brought about;* * * * *."

* * * * * *

"It is against this background that 13 years after *Brown II* commanded the abolition of dual systems we must measure the effectiveness of respondent School Board's 'freedom-of-choice' plan to achieve that end.

* * * * * *

" * * * In the light of the command of that case, what is involved here is the question whether the Board has achieved the 'racially nondiscriminatory school system' *Brown II* held must be effectuated in order to remedy the established unconstitutional deficiencies of its segregated system. *In the context of the state-imposed segregated pattern of long standing, the fact that in 1965 the Board opened the doors of the former 'white' school to Negro children and of the 'Negro' school to white children merely begins, not ends, our inquiry whether the Board has taken steps adequate to abolish its dual, segregated system.*

*Brown II* was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multi-faceted problems would arise which would require time and flexibility for a successful resolution. *School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch. * * *.*"

\* \* \* \* \* \*

"\* \* \* *'The time for mere "deliberate speed" has run out,'* Griffin v. County School Board [of Prince Edward County], 377 U.S. 218, 234, [84 S.Ct. 1226, 1235, 12 L.Ed.2d 256]; *'the context in which we must interpret and apply this language [of Brown II] to plans for desegregation has been significantly altered.'* "

\* \* \* \* \* \*

"\* \* \* *The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.*

"The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation \* \* \*."

\* \* \* \* \* \*

"We do not hold that 'freedom of choice' can have no place in such a plan. We do not hold that a 'freedom-of-choice' plan might of itself be unconstitutional, although that argument has been urged upon us. Rather, all we decide today is that *in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself.* As Judge Sobeloff has put it,

"*'Freedom of choice' is not a sacred talisman; it is only a means to a constitutionally required end—the abolition of the system of segregation and its effects.* If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end. The school officials have the continuing duty to take whatever action may be necessary to create a 'unitary, nonracial system.' " Bowman v. County School Board [of Charles City County] 382 F.2d 326, 333 (C.A. 4th Cir., 1967) (concurring opinion).

"\* \* \* Although the general experience under 'freedom of choice' to date has been such as to indicate its ineffectiveness as a tool of desegregation, there may well be instances in which it can serve as an effective device. Where it offers real promise of aiding a desegregation program to effectuate conversion of a state-imposed dual system to a unitary, nonracial system there might be no objection to allowing such a device to prove itself in operation. On the other hand, if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable."

\* \* \* \* \* \*

"\* \* \* The Board must be required to formulate a new plan and, in light of other courses which appear open to the Board, such as zoning, fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools."

(All emphasis added except for the word "required" in the first quoted paragraph and the word "now" in the fifth quoted paragraph.)

It is obvious that between 1955 and 1968 the meaning and the force of the constitutional guaranty that education if tax paid be equal for all has been intensified. The duty now appears as not simply a negative duty to refrain from active legal racial discrimination, but a duty to act positively to fashion affirmatively a school system as free as possible from the lasting effects of such historical *apartheid.* It is in this light that the actions of school boards must now be studied.

## FINDINGS OF FACT

### SOME FACTS ABOUT THE CHARLOTTE-MECKLEN-BURG SCHOOL SYSTEM:

a) *General Information.*—The system covers 550 square miles and serves more than 82,000 pupils. It is 43rd in size among the school administrative units of the United States. The county population is over 335,000. The population of Charlotte is now about 270,000. The student population increases at a rate between 2,500 and 3,000 students per year. The schools are 107 in number, including 76 elementary schools (grades 1 through 6), 20 junior high schools (grades 7 through 9) and 11 senior high schools (grades 10 through 12). The Board also operates a learning academy, 4 child development centers (kindergartens for the underprivileged) and 3 psycho-educational clinics.

The students on the rolls as of January 1969 include 44,835 elementary students, 20,675 junior high students and 16,690 senior high students. Of these students, about 29% are Negro and about 71% are white. The ratio of black to white of all ages in the county is about one to three.

The 5,880 school employees include 3,553 classroom teachers; 404 other members of the instructional staff including principals, directors and special staff members. These include 60 guidance counselors and 114 librarians. Other employees include 325 secretaries and other clerical employees, 995 cafeteria employees, 357 janitors and maids, 219 maintenance and transportation workers and 27 people assigned to educational television work. The school system is the largest employer in the state's most populous county.

The nine members of the Board of Education are elected three every two years on a non-partisan basis for six-year terms.

Over 18% of the 3,553 classroom teachers have graduate certificates. Some 2,870 or nearly 81% have Class A certificates. Some 852 teachers are men.

Of 1968's 4,095 high school graduates, about 62% or 2,539 entered college. The drop-out rate for the past two years has been approximately 2.3% of the total enrollment of the schools.

The operating budget for the system (not counting construction costs) was nearly $40,000,000 last year. Average per pupil expense was over $530. Teachers' salaries range from $5,669 to $10,230.25. School funds come 58% from the state, 35% from local sources, and 7% from federal funds.

Class size averages approximately 28 students in elementary schools (the first six grades); 26.4 in junior high schools and 29.3 in senior high schools.

All schools have libraries. The total number of books in the libraries is over 806,000, which is nearly 10 books per pupil, with a value estimated at $2,677,804. (This may be compared with the average of roughly one-half a book per pupil in the schools of the District of Columbia a couple of years ago.) These are not the textbooks which are furnished free by the state for individual use, but are library books for general circulation. Circulation last year was 2,884,252, or an average per pupil of 36 books.

The Board operates the largest food service industry in the state, serving over 70,000 meals a day on a budget of four and one-half million dollars.

Nearly one-fourth of the students (almost 20,000 last year) attend classes at the planetarium in the Children's Nature Museum. This is reportedly more children than attend regular classes at any other planetarium in the country.

Special consultants and teachers are provided in special areas such as art, music, languages, social studies, science, mathematics and physical education. Special teachers are employed to teach classes for the gifted, the mentally retarded and the physically handicapped. Guidance counselors, school psychologists and social workers are available where needed.

Faculty salaries are higher in Mecklenburg county than in most other counties of the state, by virtue of a substantial salary supplement from local taxpayers.

b) *History and Geography; Background of De Facto Segregation.*—Charlotte (270,000–plus) sits in the center of Mecklenburg County (550 square miles, total population over 335,000). The central city may be likened to an automobile hub cap, the perimeter area to a wheel, and the county area to the rubber tire. Tryon Street and the Southern Railroad run generally through the county and the city from northeast to southwest. Trade Street runs generally northwest to southeast and crosses Tryon Street at the center of town at Independence Square. Charlotte originally grew along the Southern railroad tracks. Textile mills with mill villages, once almost entirely white, were built. Business and other industry followed the highways and the railroad. The railroad and parallel highways and business and industrial development formed something of a barrier between east and west.

By the end of World War II many Negro families lived in the center of Charlotte just east of Independence Square in what is known as the First Ward—Second Ward—Cherry—Brooklyn area. However, the bulk of Charlotte's black population lived west of the railroad and Tryon Street, and north of Trade Street, in the northwest part of town. The high priced, almost exclusively white, country was east of Tryon Street and south of Trade in the Myers Park — Providence — Sharon — Eastover areas. Charlotte thus had a very high degree of segregation of housing before the first *Brown* decision.

Among the forces which brought about these concentrations should be listed the original location of industry along and to the west of the southern railroad; the location of Johnson C. Smith University two miles west of Tryon Street; the choice of builders in the early 1900's to go south and east instead of west for high priced dwelling construction; the

effect of private action and public law on choice of dwelling sites by black and by white purchasers or renters; real estate zoning which began in 1947; and the economics of the situation which are that Negroes have earned less money and have been less able to buy or rent expensive living quarters.

Local zoning ordinances starting in 1947 generally allow more varied uses in the west than in the east. Few if any areas identified as black have a residential restriction stronger than R–6, which means that a house can be built on a lot as small as 6,000 square feet. Zoning restrictions in other areas go as high as 12,000 and 15,000 square feet per lot. Nearly all industrial land in the city is in the west. The airport in the southwest with its jet air traffic inhibits residential development. Many black citizens live in areas zoned industrial, which means that the zoning law places no restriction on the use of the land. The zoning laws follow the pattern of low cost housing and industry to the west and high cost housing with some business and office developments to the east.

City planning has followed the same pattern.

Tryon Street and the Southern railroad were not built to segregate races. In the last fifteen years grade crossings have been eliminated at great expense at Fourth Street, Trade Street, Twelfth Street and Independence Boulevard; and an elevated half-mile bridge, the Brodie Griffith Skyway, is now being built across the railroad in North Charlotte at a cost of more than three million dollars. The ramparts are being pierced in many spots and inner-city highways now under construction will make communication much simpler.

However, concentration of Negroes in the northwest continues. Under the urban renewal program thousands of Negroes were moved out of their shotgun houses in the center of town and have relocated in the low rent areas to the west. This relocation of course involved many ad hoc decisions by individuals and

by city, county, state and federal governments. Federal agencies (which hold the strings to large federal purses) reportedly disclaim any responsibility for the direction of the migration; they reportedly say that the selection of urban renewal sites and the relocation of displaced persons are matters of decision ("freedom of choice"?) by local individuals and governments.. This may be correct; the clear fact however is that the displacement occurred with heavy federal financing and with active participation by local governments, and it has further concentrated Negroes until 95% or so of the city's Negroes live west of the Tryon—railroad area, or on its immediate eastern fringes.

Onto this migration the 1965 school zone plan with freedom of transfer was superimposed. The Board accurately predicted that black pupils would be moved out of their midtown shotgun housing and that white residents would continue to move generally south and east. Schools were built to meet both groups. Black or nearly black schools resulted in the northwest and white or nearly all white schools resulted in the east and southeast. Freedom of students of both races to transfer freely to schools of their own choices has resulted in re-segregation of some schools which were temporarily desegregated. The effect of closing the black inner-city schools and allowing free choices has in overall result tended to perpetuate and promote segregation.

### SOME BOARD ACTIONS FOUND NOT TO BE DISCRIMINATORY

 No racial discrimination or inequality is found in the following disputed matters:

1. *The use of federal funds for special aid to the disadvantaged.* The testimony and the exhibits failed to show that federal money was used with any discrimination by race or with any improper displacement of local money.

2. *Use of mobile classroooms.* In recent years the system has required the addition of nearly two classrooms per week. Mobile classrooms have been used to provide extra space temporarily to cope with shifts and growth in school population. Mobiles are not inferior in quality and comfort to permanent classrooms, and recent models are superior in many ways to many existing permanent classrooms. Their use and location are matters to be determined by the Board in light of the court's instructions hereafter on the preparation of a new plan for pupil assignment.

3. *The quality of the school buildings and equipment.* The evidence showed the per pupil value of the land and buildings and equipment of the various schools. Average value of these items per pupil for elementary schools was $861; for junior high schools $1,229; and for senior high schools $1,567. Schools described by witnesses as "white" ranged well up and down on both sides of that average figure and schools described by witnesses as "black" showed a similar variation. Several of the oldest and most respected "white" elementary schools in the county (Sharon Road and Steele Creek, for example) have very low per pupil facilities values. One of the newest but still all black high schools (West Charlotte) has one of the highest per pupil facilities values. The highest priced school (Olympic High) is totally desegregated (522 white and 259 black students). No racial discrimination in spending money or providing facilities appears.

4. *Coaching of athletics.* Coaches at the predominantly black schools are usually black. Coaches at the predominantly white schools are usually white. Several black coaches have been employed at "white" schools. No black coach was shown to have applied and been refused a job. No pattern of discrimination appears in the coaching ranks.

5. *Parent-Teacher Association contributions and activities.* Parents contribute to school projects through voluntary Parent-Teacher Associations. This voluntary parental action is not racial discrimination against children whose

parents are less able to make such contributions, and it does not come about through state action.

6. *School fees*. It was contended that the school fee system is discriminatory. For example, at the elementary level, grades 1 through 6, each student is supposed to bring a dollar to school at the beginning of the year to provide some extra learning aids in the form of paper, art materials and the like. In poor communities collection of this fee averages only about 50%, whereas nearly all wealthy children pay all the fees assessed in their schools. This non-payment of school fees by the poor is not a racial discrimination against the poor. The schools where people are poorer have other funds by which this 50¢ per pupil can be made up.

7. *School lunches*. School lunches are provided free to needy students. The court finds that no one has ever knowingly been denied a free lunch on racial grounds if he could not pay for it.

8. *Library books*. Library books of comparable quality and content are available to all students, black and white, in all schools in an average number of nearly ten per pupil.

9. *Elective courses*. Some elective courses such as German are offered at some but not all of the high schools. They are offered at a school only if enough students express a desire for the course. Not all schools therefore have all elective courses every year. This situation is not the result of discrimination on account of race.

10. *Individual Evaluation of Students*. Individual students are evaluated annually in terms of achievement in particular subjects, and divided into groups for the study of particular subjects in accordance with their achievement. (This is not, truly described, the "track" system which was elaborately criticized by Judge Skelly Wright in his 119-page opinion in Hobson v. Hansen, 269 F.Supp. 401 (D.C.D.C., 1967).) Few black students are in the advanced sections and most are in regular or slow sections. As-

signments to sections are made by the various schools based not on race but on the achievement of the individual students in a particular subject. There is no legal reason why fast learners in a particular subject should not be allowed to move ahead and avoid boredom while slow learners are brought along at their own pace to avoid frustration. It is an educational rather than a legal matter to say whether this is done with the students all in one classroom or separated into groups.

11. *Gerrymandering*. Gerrymandering was contended in the 1965 hearing of this case. Perhaps the evidence comes closer to proving it this time. The court is not by this order foreclosing the later assertion of that contention or for that matter any other contention which may be advanced, because it is the court's duty to keep the matter under advisement. However, in view of the court's orders herein which are expected to produce substantial changes in the pupil assignment system and a reappraisal of all zoning considerations, it is believed that nothing in particular need be said here about specific school district lines.

## SOME COMMENT ON SPECIFIC ISSUES

a) *The Present State of Desegregation.*—Defendant's Exhibit Seven (attached as an appendix to this opinion) shows pupil and faculty population for each school in the system, by races, in March of 1965 and in October of 1968. From this and other evidence the following facts are apparent:

1) *The Rural Schools Are Largely Desegregated.* Of the 32,000 rural children of all twelve grades, some 23,000, black and white, are being hauled by bus to desegregated schools. No rural schools are all-black. The only all-white county schools are four new schools in the south and east portions of the county: Beverly Woods, Devonshire, Idlewild and Lansdowne.

2) *The City Schools Are Still Largely Segregated.* A few city schools, Elizabeth (58% Negro); Highland

(13% Negro); Plaza Road (19% Negro); Randolph (28% Negro); Sedgefield (19% Negro); Spaugh (18% Negro) and Harding (17% Negro) have a substantial degree of apparently stabilized desegregation. However, most of the fully desegregated city schools are not stable in that situation, but are rapidly moving (through a temporary desegregation) from an all-white to an all-black condition. Dramatic examples are Barringer (84% Negro); Villa Heights (86% Negro); Piedmont (89% Negro); Tryon Hills (50% Negro); Hawthorne Junior High (52% Negro); Lakeview (65% Negro); and apparently Dilworth (39% Negro) and Wilmore (33% Negro).

3) *More Than Three-Fourths of the Children Attend Schools Which Have One or More Children of the Opposite Race.* In Cornelius (49% Negro), Dilworth (39% Negro), Elizabeth (58% Negro) and a few others, the races are close to being balanced in numbers. However, most schools have only a small handful of the minority race. Illustrations are: Second Ward High School (1,139 black and three white); Midwood (522 white, one black); Lincoln Heights (817 black, two white).

4) *Most Black Students Attend Totally or Almost Totally Segregated Schools.* Out of 24,000 black students:

4,780 attend nine all-black elementary schools;

3,380 attend six elementary schools which are more than 99% black;

2,491 attend three all-black junior high schools;

727 attend York Road with only six white fellow junior high students;

1,569 high school students attend all-black West Charlotte; and

1,139 black Second Ward High School students have only three white classmates.

――――
14,086

In other words, of the 24,000 or so black students, 14,086 of them attend school daily in schools that are all-black unless at York Road they see one of the six white students or at Second Ward they see one of the three white students, who were enrolled there last October.

5) *Most White Students Attend Largely or Completely Segregated Schools.* Thirteen elementary schools with 8,044 pupils are 100% white; eighteen other elementary schools with a pupil enrollment of 10,651 have only 150 black students. The total number of white elementary students is only 31,545. At the junior high level, 7,641 out of 14,741 white students attend school with only 193 black students in six schools. In the high schools, 12,310 white students attend school with 1,642 blacks, while 2,735 black students at West Charlotte and Second Ward attend school with three white students.

b) *The Opinions of Experts.*—Doctors Larson, Finger and Passy, all from Rhode Island College, of Providence, Rhode Island, testified at length. They submitted a 55-page report which outlines several possible plans for realignment of school zones and for provision of transportation; for pairing schools; for setting up feeder systems; for educational parks; and other approaches towards desegregation. None was as familiar with the local situation as the local Board and school administrators. All drew certain conclusions from the Coleman Report, which is a collection of statistics on performance of school children in certain areas about the country. Some said that kindergarten for all children would help the situation. Some said underprivileged children should start getting public education several years before first grade age. Some said that improving the faculty was important. Available statistics and expert opinion agreed that Negro students as a group do noticeably worse on achievement tests than students generally. The experts agreed that if children are underpriv-

ileged and undercultured, their school performance will be generally low. One expert, Dr. Passy, said that socio-economic-cultural background is the sole major determinant of school performance. The Abraham Lincoln-Charles Kettering theory of the rise of Americans from poor backgrounds received small support.

One point on which the experts all agree (and the statistics tend to bear them out) is that a racial mix in which black students heavily predominate tends to retard the progress of the whole group, whereas if students are mingled with a clear white majority, such as a 70/30 ratio (approximately the ratio of white to black students in Mecklenburg County), the better students can hold their pace, with substantial improvement for the poorer students.

c) *The "Neighborhood School" Theory.*—Recently, the School Board has followed what it calls the "neighborhood school" theory. Efforts have been made to locate elementary schools in neighborhoods, within walking distance of children. The theory has been cited to account for location and population of junior and senior high schools also.

"Neighborhood" in Charlotte tends to be a group of homes generally similar in race and income. Location of schools in Charlotte has followed the local pattern of residential development, including its *de facto* patterns of segregation. With a few significant exceptions, such as Olympic High School (about ⅓ black) and Randolph Road Junior High School (28% black), the schools which have been built recently have been black or almost completely black, or white or almost completely white, and this probability was apparent and predictable when the schools were built. Specific instances include Albemarle Road Elementary (99% + white); Beverly Woods' (100% white); Bruns Avenue (99%+ black); Hidden Valley (100% white); Olde Providence (98% white); Westerly Hills (100% white); Albemarle Road Junior High (93% white). .

Today people drive as much as forty or fifty miles to work; five or ten miles to church; several hours to football games; all over the county for civic affairs of various types. The automobile has exploded the old-fashioned neighborhood. Parents with children of all ages may be members of two or three separate and widely scattered school "communities." *Putting a school in a particular location is the active force which creates a temporary community of interest among those who at the moment have children in that school.* The parents' community with the school ordinarily ends the day the youngest child graduates.

If this court were writing the philosophy of education, he would suggest that educators should concentrate on planning schools as educational institutions rather than as neighborhood proprietorships. The neighborhood school concept may well be invalid for school administrative purposes even without regard for racial problems. The Charlotte-Mecklenburg School Board today, for example, is transporting 23,000 students on school busses. First graders may be the largest group so transported. If a first grader lives far enough from school to ride a bus, the school is not part of his neighborhood.

When racial segregation was required by law, nobody evoked the neighborhood school theory to *permit* black children to attend white schools close to where they lived. The values of the theory somehow were not recognized before 1965. It was repudiated by the 1955 North Carolina General Assembly and still stands repudiated in the Pupil Assignment Act of 1955–56, which is quoted above. The neighborhood school theory has no standing to override the Constitution.

d) *Bussing.*—Under North Carolina General Statutes, § 115–180, the Board is expressly authorized to operate school busses to transport school children. The state pays bus expenses only for rural children and for some who have been annexed into the city in recent years. This

apparent discrimination against city dwellers is reportedly under attack in another court. This Board already transports 23,000 students to school every day out of the 32,000 who live in the area presently eligible for bus service. The present cost of school bussing is about $19 for bus operation plus the cost of the bus which at $4,500 per bus should not exceed $20 per pupil a year. In other words, it costs about $40 a year per pupil to provide school bus transportation, out of total per pupil school operating costs of about $540. The income of many black families is so low they are not able to pay for the cost of transportation out of segregated schools to other schools of their choice.

The Board has the power to use school busses for all legitimate school purposes. Busses for many years were used to operate segregated schools. There is no reason except emotion (and I confess to having felt my own share of emotion on this subject in all the years before I studied the facts) why school busses can not be used by the Board to provide the flexibility and economy necessary to desegregate the schools. Busses are cheaper than new buildings; using them might even keep property taxes down.

e) *Faculty Desegregation.—* The Board employs over 2,600 white teachers and over 900 black teachers. New teachers hired last year numbered 700. Technically their contracts are with the Board of Education to teach where assigned. The Board makes no sustained effort to desegregate faculties. The choice where to teach is a matter between the principal and the prospective teacher. The Board assumes white teachers will tend to choose white schools and black teachers black schools.

The results of this passive selection policy are obvious. Of the thirteen all-black schools in the system serving 8,840 students, only four have any white teachers. Those four have ten white teachers and 161 black teachers for 3,662 students. Few predominantly black schools have any substantial number of white teachers, except a few schools which serve areas rapidly turning from white to black. Eight other schools 99% or more black had only six white teachers among them for 5,246 black and 24 white pupils. Second Ward and West Charlotte High Schools, with 2,700 black students and three white students, have 131 black teachers and only nine white teachers.

All of the white elementary schools have at least one and in a few cases. as many as three or four black teachers. The proportions of black teachers in the junior and senior high schools run slightly higher. The system has not operated, however, to produce any substantial teaching of black students by white teachers.

Desegregation of faculties does not depend upon proof of superiority of one group of teachers or students over the other. Whatever the discrimination that may result from a segregated faculty, it will be eliminated only when a child attending any school in the system will face about the same chances of having a black or a white teacher as he would in any other school. Mecklenburg schools pay a sizeable salary supplement. Desegregation is proceeding in other counties and school districts. It can not be assumed and should not be a tacit part of Board policy that white school teachers are opposed to equality of education or that they will refuse to teach in black schools. In fact, white and black teachers are working together in substantial numbers in several schools of this system and there was no evidence at the hearing of any friction or difficulty caused by a bi-racial faculty. It is from the teachers that children learn their first glimmerings of the right to equality of opportunity which still constitutes America's chief contribution to modern civilization. The right of all children to equal education is part of that right. It is believed that if the Board takes a stand that requires faculty desegregation and treats all teachers equally in working towards that end, the teachers will participate wholeheartedly. ·

f) *Metropolitan High School.*—Supported by impressive recommendations from Engelhart, Engelhart & Leggett, educational consultants, the Board has planned and has two million dollars on hand to build Metropolitan High School at or near the location of present Second Ward High School. In addition to being a school for conventional high school work, it is to be a center for vocational training and special courses in music, the creative and performing arts and other special subjects not practical to offer in all the high schools. Second Ward is now a 99%+ black school in the Brooklyn urban renewal area four or five blocks south of the Court House and City Hall. The First Baptist Church and the School Board itself have buildings underway on adjacent or nearby land. This is near the geographical and traffic center of the city and county, one-half a mile from the central business district, a few blocks from Central Piedmont Community College and within easy travel distance of most of the city. The location and proposed purposes appear ideal.

Plaintiffs' attorneys object to Metropolitan High School. Some present school patrons want the school built. The School Board has announced a stoppage of work on that school pending this decision.

All three groups may be proceeding upon an erroneous assumption— that the school if built will be a black school because the pupil and faculty populations will be governed by freedom of transfer and school zones as presently administered. That assumption should no longer be entertained. Pupils for regular and vocational subjects can travel or be transported to and from this area, in all directions, with greater ease than is true of any other location in the county. The nearest other high schools, Harding, West Charlotte, Garinger, East and Myers Park, form a hollow pentagon six or seven miles on the side surrounding Second Ward. It would be tragic to refrain from building a needed educational facility simply upon the assumption that it has to be an all-black school and therefore either unlawful or unattractive. The

School Board is advised to make plans for desegregation of this school along with other schools in the system. With the unrestricted statutory power to assign pupils and provide transportation, the only thing necessary to build Metropolitan High School according to the dreams of its planners is the decision to do so.

g) *The Percentage Racial Mix.*—Counsel for the plaintiffs says that since the ratio of white to black students is about 70/30, the School Board should assign the children on a basis 70% white and 30% black, and bus them to all the schools. This court does not feel that it has the power to make such a specific order. Nevertheless, the Board does have the power to establish a formula and provide transportation; and if this could be done, it would be a great benefit to the community. It would tend to eliminate shopping around for schools; all the schools, in the *New Kent County* language, would be "just schools"; it would make all schools equally "desirable" or "undesirable" depending on the point of view; it would equalize the benefits and burdens of desegregation over the whole county instead of leaving them resting largely upon the people of the northern, western and southwestern parts of the county; it would get the Board out of the business of lawsuits and real estate zoning and leave it in the education business; and it would be a tremendous step toward the stability of real estate values in the community and the progress of education of children. Though seemingly radical in nature, if viewed by people who live in totally segregated neighborhoods, it may like surgery be the most conservative solution to the whole problem and the one most likely to produce good education for all at minimum cost. It would simply put the all-white and all-black school people in the same school situation now being experienced by patrons of Cornelius, Davidson, Ranson, Long Creek, Dilworth, Olympic, Huntersville, Pineville, Randolph Road Junior High, Statesville Road, and similar schools. Such action would be supported by the unanimous testimony of all the experts

and by inferences from the Coleman Report that although mixing a few whites and a heavy majority of blacks retards the whole group, nevertheless mixing a *substantial majority of whites* and a few blacks helps the blacks to advance without retarding the whites.

█ h) *A Word About the School Board.*—The observations in this opinion are not intended to reflect upon the motives or the judgment of the School Board members. They have operated for four years under a court order which reflected the general understanding of 1965 about the law regarding desegregation. They have achieved a degree and volume of desegregation of schools apparently unsurpassed in these parts, and have exceeded the performance of any school board whose actions have been reviewed in appellate court decisions. The Charlotte-Mecklenburg schools in many respects are models for others. They are attractive to outside teachers and offer good education. The problem before this court is only one part (albeit a major part) of the educational problem. The purpose of this court is not to criticize the School Board, but to lay down some legal standards by which the Board can deal further with a most complex and difficult problem. The difference between 1965 and 1969 is simply the difference between *Brown* of 1955 and Green v. New Kent County of 1968. The rules of the game have changed, and the methods and philosophies which in good faith the Board has followed are no longer adequate to complete the job which the courts now say must be done "now."

## CONCLUSIONS OF LAW

1. Since 1965, the law has moved from an attitude barring discrimination to an attitude requiring active desegregation. The actions of School Boards and district courts must now be judged under Green v. New Kent County rather than under the milder lash of Brown v. Board of Education. The court has outlined changes which should be made in the activity and theory of the local Board.

2. The manner in which the Board has located schools and operated the pupil assignment system has continued and in some situations accentuated patterns of racial segregation in housing, school attendance and community development. The Board did not originate those patterns; however, now is the time to stop acquiescing in those patterns.

3. Freedom of transfer as operated in this system does not answer the problems of racial segregation. The evidence shows that the black students as a group have very low incomes. Freedom of transfer without transportation is to such a student often an empty right.

4. The faculties have not been adequately desegregated as directed. This permits and promotes inequality of education.

5. The court does not find any inequality based upon racial motives or reasons in the use of federal funds; the use of mobile classrooms; quality of school buildings and facilities; athletics; PTA activities; school fees; free lunches; books; elective courses; nor in individual evaluation of students. The problem of alleged gerrymandering of district lines need not be covered separately from the general order herein made.

6. There has been substantial desegregation in many areas—mostly the rural areas—of this large and complicated school system. A majority of the black students, however, still attend segregated schools and seldom, if ever, see a white fellow student. Many all-black and all-white schools still remain. The neighborhood school concept and freedom of choice as administered are not furthering desegregation.

7. The School Board has an affirmative duty to promote faculty desegregation and desegregation of pupils, and to deal with the problem of the all-black schools.

8. The School Board is free and encouraged to use school busses or other public transportation and to use mobile classrooms as needed to provide equality of educational opportunity.

9. The Board has assets and experience beyond the reach of a judge to deal with all these problems, and should be re-

quested to formulate a plan and time table of positive action.

## ORDER

1. All findings or statements of fact in this opinion and order shall be deemed conclusions of law, and all conclusions of law shall be deemed to be findings of fact as necessary in support and furtherance of this order. All competent and relevant evidence in the record has been considered in support of this order.

2. The defendant is directed to submit by May 15, 1969, a plan for the active and complete desegregation of teachers in the Charlotte-Mecklenburg school system, to be effective with the 1969–70 school year. Such plan could approach substantial equality of teaching in all schools by seeking to apportion teachers to each school on substantially the same ratio (about three to one) as the ratio of white teachers and black teachers in the system at large. It is suggested that teachers' preferences not be especially sought and that teachers be assigned as a routine matter for the purpose of accomplishing this equalization of the application of educational manpower and womanpower in the public schools. Such a plan should provide safeguards against racial discrimination in the discharge of any teachers whose jobs might be changed or abolished. Such safeguards should include provisions that if anyone has to be discharged, his qualifications will be weighed against those of all personnel in the system rather than simply against those in the capacity in which he has been working; no teacher should be dismissed or demoted or denied employment or promotion because of race or color. In other words, the Board will be expected to see to it that teachers displaced by virtue of this order will not be discriminated against on account of race.

3. The defendant is directed to submit by May 15, 1969, a plan and a time table for the active desegregation of the pupils, to be predominantly effective in the fall of 1969 and to be completed by the fall of 1970. Freedom of choice and zoning may be used in such a plan provided they promote rather than defeat desegregation. If freedom of choice is retained in such plan, it should include provision for transportation free for any student who requests transfer out of a school where his race is in the majority, and to any school where his race is in the minority, and a means of insuring that all students have full and timely knowledge of the availability of such transportation.

4. In formulating its plan the Board is, of course, free to use all of its own resources and any or all of the numerous methods which have been advanced, including pairing of grades and of schools; feeding elementary into junior high and into senior high; combinations of zone and free choice where each method proceeds logically towards eliminating segregation; and bussing or other transportation. The Board may also consider setting up larger consolidated school units freely crossing city-county lines to serve larger areas. There is no magic in existing school zone lines nor in the present size of any school. The Board is encouraged to get such aid as may be available from state and federal agencies including the offices of the Department of Health, Education and Welfare. The court does not direct a treaty with the Department, but does suggest that since its employees are in the business of dealing with these problems, they have a store of technical assets and manpower and information which could be useful in the Board's making any particular judgment or analysis.

5. The plan should be the plan of the Board for the effective operation of the schools in a desegregated atmosphere, removed to the greatest extent possible from entanglement with emotions, neighborhood problems, real estate values and pride. The court's task has not been easy, but it is fully realized that the task facing the Board is far more difficult and will require a conspicuous degree of further public service by the Board's members.

APPENDIX

Page 1

The Charlotte-Mecklenburg Schools

Research Report 2-'69

*Degree of*

SUMMATION OF /INTEGRATION -1965 (MARCH) AND 1968-69 (OCT. 1,

| | For Pupils | | | Professional Staff | |
|---|---|---|---|---|---|

**I** — Schools Having Integration

| | 1965 | 1968 | | 1965 | 1968 |
|---|---|---|---|---|---|
| For Pupils | 1 N + 22 W = 23 of 109 or 21% | 16 N + 68 W = 84 of 112 or 75% | For Staff | 3 N + 0 W = 3 of 109 or 3% | 16 N + 82 W = 98 of 112 or 87½% |

**II**

| | 1965 N | W | 1968 N | W | | 1965 N | W | 1968 N | W |
|---|---|---|---|---|---|---|---|---|---|

**A.** Number in Minority Race (integrated)

| | 1965 N | W | 1968 N | W | | 1965 N | W | 1968 N | W |
|---|---|---|---|---|---|---|---|---|---|
| Pupils | 9W | 476N | 1192W | 6704N | | 5.7W | 0N | 131W | 208N |

**B.** Number in Majority Race (integrated)

| | 1965 N | W | 1968 N | W | | 1965 N | W | 1968 N | W |
|---|---|---|---|---|---|---|---|---|---|
| Pupils | 343N | 16,446W | 8697N | 47,356W | | 143.3N | +0W | 374N | 2575W |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Total Involved by Integration

| | | | | | |
|---|---|---|---|---|---|
| Predominantly Negro Schools — — Pupils | 352 | 9889 | Staff | 149 | 505 |
| Predominatly White Schools — — Pupils | 16,922 | 54,060 | Staff | 0 | 2783 |
| ..Total — — Pupils | 17,274 or 24% of 72,336 Enrolled | 63,949 or 77% of 83,111 | Staff | 149 or 5% of 3140 incl. part assignments in schools | 3288 or 91% of 3613 assigned at one definite school |

APPENDIX

Page 2

The Charlotte-Mecklenburg Schools

RACIAL DISTRIBUTION OF PUPILS AND PROFESSIONAL STAFF
1965 (March) and 1968-69 (Oct. 1, '68)

| Grade | No. School | 1965 Pupils N | 1965 Pupils W | No. School | 1968 Pupils N | 1968 Pupils W | Professional Staff 1965 N | 1965 W | 1968 N | 1968 W |
|-------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|-----------|
| 1-6 | 72 | 9,364 | 27,696 | 76- | 13,290 | 31,545 | 377+ | 1161½ | 478 | 1329 |
| 7-9 | 17 | 2,475 | 11,804 | 21 | 5,934 | 14,741 | 111- | 533 | 228 | 706 |
| 10-12 | 8 | 1,625 | 10,677 | 11 | 4,377 | 12,313 | 65 | 479½ | 178 | 644 |
| | 97 | 13,464 | 50,177 | 108- | 23,601 | 58,599 | 553½ | 2184 | 884 | 2679 |
| Other | 12 | 6,877 | 1,818 | 4+ | 640 | 271 | 323½ | 79 | 23 | 27 |

_29.7% 82,200 71.3%_

: Kgn. + Trainable

| | | | | | | | | | |
|-------|---|------|------|--|--|--|------|-----|--|--|
| 1-4 | 1 | 360 | | | | | 15½ | | | |
| 1-7 | 2 | 431 | 207 | | | | 17 | 9½ | | |
| 1-9 | 3 | 729 | 1611 | | | | 32 | 68 | | |
| 5-9 | 1 | 505 | | | | | 25½ | | | |
| 1-12 | 3 | 2400 | | | | | 113½ | | | |
| 7-12 | 2 | 2452 | | | | | 120 | 1½ | | |

| Total | 109 | 20,341 | 51,995 | 112 | 24,241 | 58,870 | 877 | 2263 | 907 | 2706 |

_72,336T_ _83,111T_
_28.1% 71.9%_ _29.2% 70.8%_

Include Part-time Not Include Part-time

Among teachers assigned to more than one school

APPENDIX

Page 3

COMPARISON OF PUPILS AND PROFESSIONAL STAFFING BY RACE
March 6, 1965 and 1968-69 *

| School Elementary | 1965 Pupils N | %N | W | 1968-69 Pupils N | %N | W (other) | Professional Staff 1965 N | %N | W | 1968-69* N | %N | W (other) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Albemarle Rd. | | | | 4 | 1% | 499 | | | | 6 | 32% | 13 |
| Alexander Street | 342 | 100% | | 257 | 100% | | 14.1 | 100% | | 11 | 100% | |
| Ailenbrook | | | | 50 | 10% | 452 | | | | 2 | 10% | 18 |
| Ashley Park | | 0% | 694 | | 0% | 553 | | 0% | 22.9 | 2 | 9% | 20 |
| Bain | | 0% | 674 | 25 | 3% | 699 | | 0% | 28.2 | 1 | 3% | 28 |
| Barringer | | 0% | 604 | 668 | 84% | 131 | | 0% | 24.8 | 13 | 42% | 18 |
| Berryhill | | 0% | 1026 | 119 | 15% | 685 | | 0% | 39.6 | 2 | 6% | 32 |
| Bethune | 343 | 99% | 9 | 223 | 99% | 3 | 17.6 | 100% | | 11 | 100% | |
| Beverly Woods | | | | | 0% | 286 | | | | 1 | 8% | 12 |
| Biddleville | 434 | 100% | | | | | 17.2 | 100% | | | | |
| Billingsville | 729 | 100% | | 619 | 100% | 2 | 32.1 | 100% | | 25 | 100% | |
| Briarwood | 2 | 0% | 582 | 8 | 1% | 640 | | 0% | 23.9 | 3 | 12% | 22 |
| Bruns | | | | 740 | 99% | 4 | | | | 26 | 93% | 2 |
| Chantilly | | 0% | 445 | 2 | 0% | 491 | | 0% | 18.8 | 1 | 5% | 21 |
| Clear Creek | | 0% | 207 | 58 | 20% | 225 | | 0% | 9.6 | 1 | 8% | 12 |
| Collinswood | | 0% | 375 | 72 | 13% | 490 | | 0% | 16.1 | 1 | 5% | 21 |
| Cornelius | | 0% | 241 | 239 | 49% | 252 | | 0% | 11.3 | 7 | 33% | 14 |
| Cotswold | | 0% | 631 | 11 | 2% | 567 | | 0% | 25.0 | 1 | 5% | 21 |
| Crestdale | 97 | 100% | | | | | 5.0 | 100% | | | | |
| Davidson | | 0% | 178 | 101 | 35% | 186 | | 0% | 7.8 | 1 | 8% | 11 |
| Marie Davis | 808 | 100% | | 705 | 100% | | 34.3 | 100% | | 29 | 100% | |
| Derita | 6 | 1% | 892 | 165 | 18% | 728 | | 0% | 35.4 | 3 | 9% | 32 |
| Devonshire | 2 | 0% | 474 | | 0% | 889 | | 0% | 19.5 | 4 | 10% | 37 |
| Dilworth | 100 | 20% | 401 | 223 | 39% | 355 | | 0% | 23.8 | 4 | 15% | 22 |
| Double Oaks | 703 | 100% | | 800 | 100% | | 28.2 | 100% | | 32 | 100% | |
| Druid Hills | 520 | 100% | | 504 | 99% | 3 | 20.7 | 100% | | 20 | 100% | |
| Eastover | | 0% | 704 | 49 | 8% | 580 | | 0% | 27.1 | 1 | 4% | 24 |
| Elizabeth | 5 | 1% | 448 | 270 | 58% | 194 | | 0% | 22.9 | 2 | 9% | 21 |
| Enderly Park | | 0% | 368 | 2 | 1% | 374 | | 0% | 14.9 | 1 | 6% | 15 |
| Fairview | 702 | 100% | | 363 | 100% | | 28.0 | 100% | | 19 | 100% | |
| First Ward | 473 | 100% | | 749 | 100% | | 22.8 | 100% | | 30 | 100% | |
| J. H. Gunn | 696 | 100% | | | | | 33.6 | 100% | | | | |
| Hickory Grove | | 0% | 530 | 80 | 13% | 531 | | 0% | 21.7 | 1 | 4% | 23 |
| Hidden Valley | | | | | 0% | 977 | | | | 2 | 5% | 35 |
| Highland | 2 | 1% | 273 | 47 | 13% | 324 | | 0% | 14.0 | 1 | 7% | 14 |

(Margin annotations: 1-9 '65 beside Bain; 1-9 '65 beside Billingsville; 1-7 '65 beside Clear Creek; 1-12 '65 beside First Ward)

* Does not include staff assigned to more than one school per HEW request.

%/N is nearest whole per cent that N is of total

APPENDIX

Page 4

## COMPARISON OF PUPILS AND PROFESSIONAL STAFFING BY RACE
### March 6, 1965 and 1968-69 *

| | School Elementary | 1965 Pupils | | | 1968-69 Pupils | | | Professional Staff 1965 | | | Professional Staff 1968-69* | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | %N | W | N | %N | W (other) | N | %N | W | N | %N | W (other) |
| | Hoskins | | 0% | 342 | 18 | 6% | 261 | | 0% | 14.7 | 2 | 15% | 11 |
| | Huntersville | | 0% | 553 | 162 | 22% | 560 | | 0% | 22.9 | 2 | 7% | 25 |
| | Huntingtowne Farms | | 0% | 358 | 7 | 1% | 695 | | 0% | 15.1 | 1 | 4% | 26 |
| | Idlewild | | 0% | 592 | 2 | 0% | 521 | | 0% | 23.9 | 1 | 4% | 22 |
| 1-4/65 | Amay James | 360 | 100% | | 477 | 100% | 1 | 15.5 | 100% | | 19 | 100% | |
| 1-7/65 | Ada Jenkins | 431 | 100% | | | | | 17.0 | 100% | | | | |
| | Lakeview | | 0% | 400 | 269 | 65% | 147 | | 0% | 18.5 | 14 | 74% | 5 |
| | Lansdowne | | 0% | 633 | | 0% | 758 | | 0% | 23.9 | 1 | 3% | 30 |
| | Lincoln Heights | 783 | 100% | | 817 | 100% | 2 | 29.1 | 100% | | 30 | 100% | |
| | Long Creek | | 0% | 423 | 250 | 35% | 466 | | 0% | 17.6 | 2 | 7% | 26 |
| 1-9/65 | Matthews | | 0% | 937 | (1-6)93 | 11% | 742 | | 0% | 39.7 | 1 | 3% | 32 |
| | Merry Oaks | | 0% | 538 | | 0% | 469 | | 0% | 21.9 | 1 | 5% | 19 |
| | Midwood | | 0% | 560 | 1 | 0% | 522 | | 0% | 24.9 | 2 | 9% | 21 |
| | Montclaire | | 0% | 720 | | 0% | 722 | | 0% | 29.1 | 1 | 4% | 27 |
| | Morgan | 305 | 100% | | | | | 14.9 | 100% | | | | |
| | Myers Park | | 0% | 575 | 23 | 4% | 543 | | 0% | 24.9 | 1 | 4% | 23 |
| | Myers Street | 820 | 100% | | | | | 32.2 | 100% | | | | |
| | Nations Ford | | 0% | 513 | 63 | 10% | 585 | | 0% | 21.6 | 1 | 4% | 25 |
| | Newell | | 0% | 463 | 73 | 15% | 423 | | 0% | 18.3 | 1 | 5% | 18 |
| | Oakdale | | 0% | 402 | 72 | 13% | 480 | | 0% | 17.2 | 1 | 5% | 21 |
| | Oakhurst | | 0% | 548 | 2 | 0% | 615 | | 0% | 22.8 | 1 | 4% | 23 |
| | Oaklawn | 666 | 100% | | 650 | 100% | | 26.0 | 100% | | 25 | 93% | 2 |
| | Olde Providence | | | | 10 | 2% | 434 | | | | 1 | 6% | 17 |
| | Park Road | | 0% | 583 | | 0% | 551 | | 0% | 22.7 | 1 | 5% | 21 |
| | Paw Creek | | 0% | 793 | 63 | 7% | 861 | | 0% | 30.3 | 1 | 3% | 31 |
| | Pineville | | 0% | 364 | 168 | 32% | 363 | | 0% | 16.2 | 1 | 5% | 21 |
| | Pinewood | | 0% | 719 | | 0% | 707 | | 0% | 28.1 | 1 | 4% | 26 |
| | Plaza Road | | 0% | 400 | 99 | 19% | 409 | | 0% | 17.7 | 1 | 5% | 21 |
| | Rama Road | | 0% | 442 | 2 | 0% | 777 | | 0% | 18.7 | 2 | 7% | 27 |
| | Sedgefield | 3 | 1% | 526 | 7 | 1% | 545 | | 0% | 21.8 | 2 | 9% | 20 |
| 5-9/65 | Plato Price | 505 | 100% | | | | | 25.4 | 100% | | | | |
| | Selwyn | | 0% | 531 | 5 | 1% | 598 | | 0% | 21.9 | 1 | 4% | 22 |
| | Seversville | 96 | 30% | 229 | | | | | 0% | 14.8 | | | |
| | Shamrock Gardens | | 0% | 536 | | 0% | 539 | | 0% | 21.9 | 1 | 5% | 20 |
| | Sharon | | 0% | 591 | | 0% | 519 | | 0% | 22.9 | 1 | 5% | 20 |

APPENDIX

Page 5

3

## COMPARISON OF PUPILS AND PROFESSIONAL STAFFING BY RACE
### March 6, 1965 and 1968-69 *

| School Elementary | 1965 Pupils | | | 1968-69 Pupils | | | Professional Staff 1965 | | | 1968-69* | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | %N | W | N | %N | W (other) | N | %N | W | N | %N | W (other) |
| Starmount | | 0% | 481 | 25 | 3% | 713 | | 0% | 20.9 | 1 | 3% | 28 |
| Statesville Road | | 0% | 650 | 295 | 36% | 534 | | 0% | 25.9 | 3 | 9% | 29 |
| Steele Creek 1-12/65 | | 0% | 222 | 12 | 2% | 531 | | 0% | 10.7 | 1 | 5% | 20 |
| Sterling 1-12/65 | 699 | 100% | | | | | 33.9 | 100% | | | | |
| Thomasboro | | 0% | 885 | | 0% | 705 | | 0% | 34.3 | 2 | 7% | 25 |
| Torrence-Lytle 1-12/65 | 1005 | 100% | | | | | 46.1 | 100% | | | | |
| Tryon Hills | | 0% | 324 | 241 | 50% | 245 | | 0% | 15.0 | 1 | 5% | 20 |
| Tuckaseegee | | 0% | 631 | 61 | 10% | 553 | | 0% | 23.9 | 1 | 4% | 23 |
| University Park | 700 | 100% | | 777 | 100% | | 25.8 | 100% | | 30 | 97% | 1 |
| Zeb Vance | 465 | 100% | | 257 | 100% | | 19.5 | 100% | | 11 | 100% | |
| Villa Heights | 23 | 4% | 594 | 796 | 86% | 126 | | 0% | 28.3 | 23 | 62% | 14 |
| Wesley Heights | 214 | 100% | | | | | 8.3 | 79% | 2.2 | | | |
| Westerly Hills | | | | | 0% | 569 | | | | 1 | 4% | 22 |
| Wilmore | 6 | 2% | 323 | 145 | 33% | 293 | | 0% | 15.4 | 8 | 40% | 12 |
| Windsor Park | 1 | 0% | 679 | 2 | 0% | 737 | | 0% | 25.8 | 1 | 4% | 27 |
| Winterfield | | 0% | 455 | | 0% | 689 | | 0% | 18.7 | 1 | 4% | 26 |
| Woodland | 360 | 100% | | | | | 14.8 | 100% | | | | |
| Woodlawn | | 0% | 283 | | | | | 0% | 14.0 | | | |
| Isabella Wyche | 383 | 100% | | 222 | 100% | | 18.6 | 100% | | 12 | 100% | |

Child Development (Kgn.)

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Davidson, Center #1 | | | | 83 | 41% | 117 | | | | 3 | 30% | 7 |
| Pineville, Center #2 | | | | 166 | 82% | 37 | | | | 2 | 20% | 8 |
| Seversville, Center #3 | | | | 174 | 87% | 26 | | | | 8 | 80% | 2 |
| Morgan, Center #4 | | | | 188 | 97% | 6 | | | | 8 | 80% | 2 |

APPENDIX

Page 6

COMPARISON OF PUPILS AND PROFESSIONAL STAFFING BY RACE
March 6, 1965 and 1968-69 *

| School Junior High | 1965 Pupils | | | 1968-69 Pupils | | | Professional Staff 1965 | | | 1968-69 * | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | %N | W | N | %N | W (other) | N | %N | W | N | %N | W (other) |
| Albemarle Road | | | | 66 | 7% | 881 | | | | 4 | 9% | 43 |
| Alexander | | 0% | 577 | 347 | 31% | 755 | | 0% | 28.9 | 6 | 12% | 44 |
| Cochrane | | 0% | 872 | 76 | 5% | 1444 | | 0% | 35.4 | 6 | 10% | 56 |
| Coulwood | 3 | 1% | 574 | 119 | 14% | 727 | | 0% | 27.1 | 4 | 11% | 34 |
| Eastway | | 0% | 1046 | 3 | 0% | 1364 | | 0% | 43.2 | 3 | 5% | 55 |
| Alex. Graham | | 0% | 1048 | 8 | 1% | 1084 | | 0% | 43.8 | 4 | 9% | 43 |
| Hawthorne | 25 | 4% | 670 | 492 | 52% | 447 | | 0% | 33.9 | 12 | 27% | 33 |
| Irwin Ave. | 785 | 100% | | 666 | 100% | | 42.7 | 100% | | 32 | 97% | 1 |
| McClintock | | 0% | 1273 | 46 | 4% | 1228 | | 0% | 51.5 | 2 | 4% | 49 |
| Northwest | 773 | 100% | | 932 | 100% | | 33.7 | 100% | | 39 | 100% | |
| Piedmont | 121 | 29% | 291 | 428 | 89% | 53 | | 0% | 26.8 | 13 | 52% | 12 |
| Quail Hollow | | 0% | 766 | 171 | 12% | 1261 | | 0% | 35.2 | 3 | 5% | 61 |
| Randolph | | | | 272 | 28% | 711 | | | | 2 | 5% | 38 |
| Ranson | 9 | 1% | 658 | 253 | 30% | 586 | | 0% | 30.0 | 6 | 16% | 31 |
| Sedgefield | 6 | 1% | 920 | 189 | 19% | 802 | | 0% | 40.5 | 5 | 11% | 39 |
| Smith | | 0% | 1115 | | 0% | 1389 | | 0% | 48.6 | 3 | 5% | 57 |
| Spaugh | 1 | 0% | 930 | 186 | 18% | 871 | | 0% | 42.5 | 6 | 12% | 43 |
| Williams | 752 | 100% | | 893 | 100% | | 34.9 | 100% | | 37 | 100% | |
| Wilson | | 0% | 1064 | 60 | 5% | 1132 | | 0% | 45.6 | 4 | 8% | 45 |
| York Rd. | (7-12) 1041 | 100% | | 727 | 99% | 6 | 49.9 | 100% | | 32 | 97% | 1 |

Learning Academy - 7th & 8th grades
counted in JH, above, 5 19% 21

APPENDIX

Page 7

## COMPARISON OF PUPILS AND PROFESSIONAL STAFFING BY RACE
### March 6, 1965 and 1968-69 *

| | | | | | | | | | | | | Professional Staff | | | |
| School | | | | | | | | 1965 | | | 1968-69* | | | |
| Senior High | N | %N | W | N | %N | W (other) | N | %N | W | N | %N | W (other) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| East Mecklenburg | | 0% | 1782 | 155 | 8% | 1739 | | 0% | 79.2 | 6 | 7% | 85 |
| Garinger | 2 | 0% | 2266 | 202 | 9% | 2157 | | 0% | 100.0 | 6 | 6% | 102 |
| Harding | | 0% | 1002 | 169 | 17% | 814 | | 0% | 48.0 | 4 | 8% | 49 |
| Independence | | | | 92 | 9% | 962 | | | | 6 | 9% | 59 |
| Myers Park | 31 | 2% | 1772 | 158 | 8% | 1855 | | 0% | 76.7 | 6 | 6% | 87 |
| North Mecklenburg | 1 | 0% | 1155 | 410 | 27% | 1109 | | 0% | 51.8 | 6 | 9% | 63 |
| Olympic | | | | 259 | 33% | 522 | | | | 5 | 11% | 39 |
| Second Ward | 1411 | 100% | | 1139 | 100% | 3 | 70.0 | 98% | 1.5 | 57 | 95% | 3 |
| South Mecklenburg | 30 | 2% | 1430 | 106 | 6% | 1812 | | 0% | 72.0 | 4 | 5% | 78 |
| West Charlotte | 1560 | 100% | | 1569 | 100% | | 65.0 | 97% | 2.0 | 74 | 93% | 6 |
| West Mecklenburg | 1 | 0% | 1270 | 118 | 8% | 1340 | | 0% | 61.4 | 4 | 5% | 73 |

7-12 65