Robert L. DOWELL, an infant, who sues by A. L. Dowell, his father and next friend, Plaintiffs,

v.

The BOARD OF EDUCATION OF the OKLAHOMA CITY PUBLIC SCHOOLS; and Superintendent of the Oklahoma City Public Schools, Defendants,

and

The McWilliams, Hendrickson and Baker Groups, Intervenors.

Civ. No. 9452.

United States District Court
W. D. Oklahoma.

Jan. 17, 1970.

John W. Walker and Philip E. Kaplan, Little Rock, Ark., and Archibald B. Hill, Jr., Oklahoma City, Okl., for plaintiffs. by A. L. Dowell.

J. Harry Johnson, Leslie L. Conner and James M. Little, Oklahoma City, Okl., for defendants by members of the Board of Education of the Oklahoma City Public Schools and by their counsel.

George F. Short, Norman E. Reynolds and George S. Guysi, Oklahoma City, Okl., for the McWilliams group (Belle Isle Neighborhood association).

William G. Smith, C. Harold Thweatt and Robert H. Warren, Oklahoma City, Okl., for the Hendrickson group (Linwood neighborhood association).

J. Howard Edmondson and Joe Cannon, Oklahoma City, Okl., for the Baker group (intervening plaintiffs allegedly representing some 10,000 persons, members of the Neighborhood School Association).

## ORDER

BOHANON, Chief Judge.

The Defendant, in its proposed Amendment filed with the Clerk of this Court on January 12, 1970, asked that this Court permit the following requested change in its Comprehensive Plan of Desegregation, which Comprehensive Plan was filed on November 6, 1969:

"Beginning the 1970–71 school year, the boundaries of the attendance areas of Northeast Senior High School, John Marshall Senior High School and Northwest Classen Senior High School (senior high level, grades 10 through 12) will be the same as they were during the 1968–69 school year. It is believed that these changes will make implementation of this Plan more effective and acceptable to the patrons of the Oklahoma City Public Schools."

It is the Order of this Court that said Amendment be, and the same is hereby denied, and it is especially ordered that the attendance area for Northeast High School, John Marshall High School and Northwest Classen High School be and remain the same as for the school year 1969–70 until further order of the Court.

The Court finds that said proposed Amendment, if approved, would be a retreat from the steps thus far taken to desegregate the Oklahoma City Public School System.

APPLICATION FOR APPROVAL OF AMENDMENT TO COMPREHENSIVE PLAN FOR COMPLETE DESEGREGATION OF THE JUNIOR AND SENIOR HIGH SCHOOLS OF THE OKLAHOMA CITY PUBLIC SCHOOLS AFTER THE 1969–70 SCHOOL YEAR

The Court is requested to approve an amendment to the Comprehensive Plan for Complete Desegregation of Junior and Senior High Schools of the Oklahoma City Public Schools after the 1969–70 school year, filed herein on November 6, 1969, which amendment would change the first paragraph on page 7 of the Plan to read as follows:

"At the outset, if the Order of August 13, 1969, in Civil 9452 of the United States District Court for the Western District of Oklahoma, approving the plan for further desegregation in the 1969–70 school year, remains in effect and is not vacated or modified by the United States Court of Appeals or the Supreme Court of the United States, then the attendance area fixed by the plan for Harding Junior High School will be the attendance area for Harding.

"Beginning the 1970–71 school year, the boundaries of the attendance areas of Northeast Senior High School, John Marshall Senior High School and Northwest Classen Senior High School

(senior high level, grades 10 through 12) will be the same as they were during the 1968–69 school year. It is believed that these changes will make implementation of this Plan more effective and acceptable to the patrons of the Oklahoma City Public Schools."

(s) J. Harry Johnson
Attorney for Defendants.

STATISTICS FURNISHED THE COURT AS TO WHAT THE PERCENTAGE OF BLACK AND WHITE STUDENTS WOULD BE IN HARDING JUNIOR HIGH SCHOOL AND NORTHEAST HIGH SCHOOL IF THE BOUNDARIES ARE RETURNED TO THOSE IN EFFECT DURING THE YEAR 1968–69

OKLAHOMA CITY PUBLIC SCHOOLS
December 19, 1969

Pupil Membership by Grade and Race

| HARDING | NEGRO | OTHER | TOTAL | % NEGRO |
|---|---|---|---|---|
| 7th | 113 | 332 | 445 | 25.4 |
| 8th | 141 | 321 | 462 | 30.5 |
| 9th | 107 | 288 | 395 | 27.1 |
| 7–9 | 361 | 941 | 1302 | 27.8 |
| NORTHEAST | | | | |
| 10th | 144 | 272 | 416 | 34.6 |
| 11th | 134 | 222 | 356 | 37.7 |
| 12th | 151 | 109 | 260 | 58.0 |
| 10–12 | 429 | 603 | 1032 | 41.6 |

Predictions For 1970–71 If Boundaries Are Returned to Those In Effect During The 1968–69 School Year

| HARDING | | | | |
|---|---|---|---|---|
| 7th | 187 | 194 | 381 | 49.1 |
| 8th | 162 | 181 | 343 | 47.2 |
| 9th | 148 | 168 | 316 | 46.8 |
| 7–9 | 497 | 543 | 1040 | 47.8 |
| NORTHEAST | | | | |
| 10th | 150 | 149 | 299 | 50.2 |
| 11th | 248 | 132 | 380 | 65.3 |
| 12th | 168 | 112 | 280 | 60.0 |
| 10–12 | 566 | 393 | 959 | 59.0 |

---

OPINION AND ORDER

PRELIMINARY STATEMENT

BOHANON, Chief Judge.

On December 15, 1969, after notice to all interested parties, this case came on regularly for hearing to consider the Comprehensive Plan for Complete Desegregation of the Junior and Senior High Schools of the Oklahoma City Public Schools filed herein on November 6, 1969. The plaintiffs appeared by A. L. Dowell and their counsel, John W. Walker and Philip E. Kaplan of Little Rock, Arkansas, and Archibald B. Hill, Jr., of Oklahoma City. The Defendants appeared by members of the Board of Education of the Oklahoma City Public

Schools and by their counsel, J. Harry Johnson, Leslie L. Conner and James M. Little of Oklahoma City. The McWilliams group (Belle Isle Neighborhood association) was represented by George F. Short, Norman E. Reynolds and George S. Guysi of Oklahoma City. The Hendrickson group (Linwood neighborhood association) was represented by William G. Smith, C. Harold Thweatt and Robert C. Warren of Oklahoma City. Additionally, the Baker group (intervening plaintiffs allegedly representing some 10,000 persons, members of the Neighborhood School Association) was represented by J. Howard Edmondson and Joe Cannon of Oklahoma City.[1] A full evidential hearing was then held wherein the defendants, the plaintiffs and the intervenors offered oral and documentary evidence.[2]

From the evidence, the Court finds:

## FACTS

On November 5, 1969, the Board of Education of the Oklahoma City Public Schools (herein referred to as the Board), by unanimous vote, adopted a comprehensive plan for complete desegregation of the Oklahoma City Secondary schools; and on November 6, 1969, filed such plan with this Court.[3]

### The Plan

### Summary

The Plan is a new concept in school utilization; it views all secondary schools as a unitary system.[4] (A copy of such Plan, as supplemented, is appended and made a part of this *Opinion and Order*.[5]

A variety of approaches are combined: the neighborhood schools, the specialized centers, the educational park, and modular scheduling. In addition, the Plan calls for maximum use of physical facilities, faculties and staff personnel.

The Oklahoma City high schools will be divided into two clusters and within each cluster every school will serve two purposes: (1) It will be a home-base

1. On December 10, 1969, a minute order was entered: "Complaint of Intervening Rebecca Diane Baker, et al is granted on temporary basis and the Court will determine whether or not intervenor Rebecca Diane Baker et al are necessary and proper parties after the hearing on December 15, 1969 (Bohanon)." At the December 15 hearing all parties announced ready except the Intervenors McWilliams group (Belle Isle) and Hendrickson group (Linwood); their counsel observed in open court that the matters raised by these intervenors were now on appeal to the United States Court of Appeals, Tenth Circuit, and said groups asked that the hearing be held without them or their counsel being present, and they were excused.

2. Before the hearing's conclusion on December 16, 1969, Dr. Tom J. Smith, Assistant Superintendent of the Oklahoma City Public Schools and Coordinator of the preparation of the Comprehensive Plan, agreed that a supplement to the Plan would be submitted, said supplement to deal with desegregation of Dunjee and Kennedy Junior High Schools, and interaction among black and white students of constituent schools.

3. The Board invited 104 groups, organizations and individual persons to submit suggestions or recommendations for a

comprehensive plan, and the assistance of the office of Education, United States Department of Health, Education, and Welfare was requested. The concept of the "cluster" method of desegregation in the Comprehensive Plan was presented to the Board by Dr. Robert E. Ohm, Dean of the College of Education of the University of Oklahoma; Dr. Robert F. Bibens, Associate Professor of Education, University of Oklahoma; Dr. Raymond P. Lutz, Associate Professor, Industrial Engineering, University of Oklahoma; and Dr. George Henderson, Goldman Professor of Human Relations, University of Oklahoma.

4. "The entire plan is based on the idea of treating the ten high schools as a total system rather than as ten, independent, self-contained units, each unit of which would be required to conform to some formula or ratio of mixing white and minority groups * * *." (Plf's Exh. 9, p. 2, par. 4).

5. Appendix 1 is a copy of "Comprehensive Plan for Complete Desegregation of Junior and Senior High Schools of the Oklahoma City Public Schools" (Adopted by Board of Education, November 5, 1969, and Supplement thereto filed wth the Court January 12, 1970; Def's Exh. 1, as supplemented).

school for students who live within its geographical attendance area; (2) It will be a Center offering a full curricular program in a specialized field. Students will participate in certain prescribed activities in the school located in their attendance area and will move to other schools, within the Cluster, for course work in other fields.[6]

On the junior high school level, one predominantly black school will be closed and its population divided among six predominantly white schools.[7] The predominantly black seventh grade of another school will be reassigned to a predominantly white school.[8]

## General Terms and Policy

Each school, in its role as home-base, will offer to its resident students some elective courses and activities such as physical education, athletics, and music. In its role as a specialized center, it will in addition offer a full range of courses in that particular curriculum to students from several attendance areas, including its own.[9]

The advantages of the home-base-specialized center plan will be felt in all areas of the educational process. By concentrating materials, equipment and staff involved in each academic discipline in a special location, the finest of each will be available to students on an equal opportunity basis; and such concentration will make possible the acquisition of a larger variety of such materials by eliminating the need for duplicating the same facilities in all the schools.[10] Moreover, advantages will accrue as to curriculum. At present, there are many courses which cannot be offered at all schools because of a limited demand, a lack of facilities, or a shortage of teaching personnel.[11] Through the concentra-

6. Appendix 2 to this *Opinion and Order* (and made a part hereof) is a copy of School District Map of Independent School District Number 89 of Oklahoma County, Oklahoma (Oklahoma City Public Schools) which shows geographic boundaries of said district, High School locations and location of Clusters A and B (Def's Exh. 2). See Plf's Exh. 4 for detailed Map of the Oklahoma City Public Schools.

7. Effective with the 1970–71 school year Moon Junior High School, which student body is presently 99 percent black will be closed and pupils residing in its attendance area wil be assigned to Central, Capitol Hill, Jackson, Jefferson, Roosevelt, and Webster Junior High Schools, schools which are predominantly white.

8. The seventh grade students residing in the Longfellow area, now attending Eisenhower which is predominantly black and seriously overcrowded, will be assigned to Hoover Junior High School, now primarily white. See Appendix 3 to this *Opinion and Order* (made a part hereof), an extract from Plf's Exh. 2, p. 4, a statistical chart showing "Pupil Membership by Grade and Race" in Oklahoma City Secondary Schools as of December 5, 1969.

9. For example, one school can serve as a Science center, another Mathematics, an-

other Language, another Social Studies, etc.

10. As an example, the Science Centers will house all of the laboratory facilities, materials, and libraries relating to the courses taught there, thus facilitating their use by faculty and students.

11. "Each specialized school center would have a staff of teachers and subject consultants available for participation in conducting programs found in the local school, as well as courses and programs not normally available in the traditional school setting. With the very best teachers of an academic discipline located in one center a more realistic meaning could be given to the concept of equality of educational opportunity. In addition to this, a subject-area consultant must normally spread his attention among all secondary schools in the urban system * * *. The specialized school center will allow the subject-area specialist, the consultant for the school district, to concentrate his time and efforts at the instructional scene, working directly with the staff members involved in his particular discipline." (Plf's Exh. 9, pp. 8–9, par. F)

Parenthetically, considerable progress has been made in integrating the 21.5% Negro faculty presently teaching at Oklahoma City secondary levels. As of De-

tion of all three of these elements, the present curriculum can be readily expanded.[12] And this obvious benefit will be accented by modular scheduling calculated to personalize the program for each student.[13]

This division of the high schools into two clusters minimizes the problems of access and transportation.[14] Students will spend varying amounts of time each week in each of the Centers, but not less than half the school day at any one Center. The exact amount will be determined based upon each student's needs and requirements.[15]

The plan's structure insures positive and constructive desegregation regardless of wide variation in individual scheduling. Active recruitment of voluntary majority to minority transfers throughout the system at all grade levels will continue and will also be the policy

cember 5, 1969, the *percentage* of Negro faculty teaching at each school was as follows: Capitol Hill Jr. 6.6; Capitol Hill Sr. 5.6; Central 14.0; Classen 8.3; Douglass 75.7; Dunjee 68.5; Eisenhower 7.8; Grant 4.6; Harding 22.0; Hoover 3.2; Jackson 4.5; Jefferson 3.1; Kennedy 65.5; Marshall 4.9; Moon 71.4; Northeast 40.6; Northwest 3.4; Roosevelt 9.0; Southeast 5.5; Star Spencer 14.8; Taft 6.1; Webster 5.5; Voc. Tech. 3.8; Rogers 18.6; Carver 25.0; Washington 18.1 (See Plf's Exh. 3). This Comprehensive Plan should erase all faculty distinctions related to race or color.

12. Significantly, *programs* designed for both *slow* and *accelerated* students will be more easily instituted in this setting, as will special compensatory programs for students with academically deficient backgrounds and advanced courses for students with particular interests.

13. "The course offerings made possible in the specialized school centers form an extremely beneficial portion of the proposed program. Even the lay person recognizes that in an urban community, some schools are able to provide courses which other schools cannot offer. Yet, each school which is plagued with a limited curriculum houses a few students who could benefit by exposure to certain expanded offerings. For example, all schools in an urban community certainly cannot offer the range and depth of study in a variety of foreign languages which might be ultimately desirable. Also, few individual schools can boast the kind of facilities and staff desired in special programs such as remedial reading. Broadened programs for both slow and accelerated students could be made possible by utilization of the Specialized School Center, and the centralization of facilities and staff competencies" (Plf's Exh. 9, p. 9, par. H).

14. Capitol Hill, Douglass, Grant, and Southeast High Schools will comprise

Cluster A. Classen, John Marshall, Northeast, Northwest Classen, Dunjee, and Star-Spencer will comprise Cluster B. Moreover, absent the vacating of this Court's Order of August 13, 1969, by a higher Court, the attendance areas fixed by that plan for Harding and Northeast will be the attendance areas for these schools. If such Order should be vacated, the attendance areas of Harding and Northeast will be the same as those in effect for those two schools at the end of the 1968–1969 school year.

15. The modular scheduling, a tested and accepted means for meeting individual needs through class periods of varying lengths and different methodologies, will add an extra dimension of flexibility. "During the initial phases of the planning period, a research model will be constructed, utilizing relevant data such as detailed information on facilities, faculty, curriculum, and students. The model will be used to adapt and modify the modular scheduling program, to add a routing plan to the transportation program and integrate that program with scheduling, to monitor cost-effectiveness information, to train personnel in using the model, and to document the program. Repeated testing of the model by runs through the computer system will point up discrepancies and conflicts and enable the research team to refine the model and produce a final schedule of teaching assignments, facility utilization, student schedules and transportation routing and utilization. During the planning process, experienced, qualified consultants will be used to work with and train school personnel in the use of computer programming and output and in making the most effective use of the complex data provided. Teachers and students will be instructed in the ways in which the new system can be utilized for maximum benefit * * *." (Plan, p. 11).

at the home-base schools.[16] Moreover, even that student who spends most of his time in his home-base school will be regularly exposed to students from all ethnic groups in the specialized courses offered there. The pattern of moving students from one attendance area to another offers each the widest possible association with others. Equally important, this association will improve the academic program for all students and will aid in establishing a uniform grade level structure for all secondary schools in the district.

## THE LAW

### Historical Review

In 1954 the United States Supreme Court ruled: that where a state has undertaken to provide for public education, such opportunity must be made available to all on equal terms; and racial segregation of children deprives minority group children of equal educational opportunities, even though the physical facilities and other tangible factors may be equal; and that the "separate but equal" doctrine adopted in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, has no place in the field of public education. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873.[17]

In 1955 the Supreme Court ruled: that public education racial discrimination is unconstitutional and all provisions of federal, state or local law must yield to this principle; that school authorities have the primary responsibility for implementing the governing constitutional principles; that in fashioning the decrees, the Courts will be guided by equitable principles—characterized by a practical flexibility; and specifically directed the District Courts to enter Orders and Decrees necessary to permit admission "to public schools on a racially nondiscriminatory basis with all deliberate speed * * *." Brown v. Board of Education of Topeka, 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083.

In 1958 the High Court held that where due to actions by state officials opposing desegregation, and to threats of mob violence, respondents were unable to attend the school until Federal troops were sent; and where these events resulted in tensions, bedlam and turmoil in the school which admittedly disrupted the educational process, nonetheless the constitutional rights of the Negro respondents were not to be sacrificed or yielded, and reversed the District Court which had temporarily suspended the integration plan. Cooper v. Aaron, (Arkansas) 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5.[18]

16. The Oklahoma City Public Schools Majority-Minority Transfers (1969–70) as to elementary schools demonstrates a need for further positive action by the Board to bring about unitary schools, as contrasted with a dual system at the elementary level (See Plf's Exh. 1). Hence this Court's Order of September 11, 1969, providing in part: "The Motion to delay the making, preparing and filing a good faith plan of desegregation insofar as it affects the elementary schools in the defendant district is hereby granted, and the defendant Board is granted until March 31, 1970, to prepare its plan for desegregation insofar as the elementary schools are concerned," even though the plan for 1969–70 was approved by this Court on August 8, 1969.

17. "We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate edu-

cational facilities are inherently unequal. * * *" Brown I, supra, at 495, 74 S.Ct. at 692.

18. As mentioned in Cooper at 16, 78 S.Ct. at 1409: "The constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which have followed upon the actions of the Governor and Legislature. As this Court said some 41 years ago in a unanimous opinion in a case involving another aspect of racial segregation: 'It is urged that this proposed segregation will promote the public peace by preventing race conflicts. Desirable as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal constitution.' Buchanan v. Warley, 245 U.S. 60, 81, 38 S.Ct. 16, 62 L.Ed. 149. * * *"

Then in 1962 the Court struck down a plan provision permitting any student upon request to transfer back to his former school where he would be in the racial majority since such inevitably would perpetuate educational racial segregation. Goss v. Board of Education of Knoxville, Tennessee, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632.[19]

### Oklahoma City Public Schools

With the foregoing law of record, this Court was first asked to deal with the educational racial segregation existing in the Oklahoma City Public Schools; and on July 11, 1963, filed its Opinion holding that the City School Board's refusal to grant the request for transfer of plaintiff Dowell from a predominantly Negro school to predominantly a white school was because of race and color and that such denial was an unlawful discrimination. Dowell v. School Board of the Oklahoma City Public Schools, 219 F.Supp. 427 (D.C.W.D.Okl., 1963). In *Dowell I,* supra, this Court observed that the Oklahoma constitutional and statutory provisions for school segregation were unconstitutional and unenforceable.[20] This Court also recognized that restrictive covenants prohibiting sale of land to persons of the Negro race were unenforceable, and at 433 noted:

"* * * when new additions were added to the cities and towns of Oklahoma, it was generally the practice

of developers to provide in the plats restrictive covenants on lands used for new homes or dwelling places, prohibiting the sale of lands or lots or the ownership by persons of the Negro race."

Moreover, this Court had no choice but both to find:

"* * * the residential pattern of the white and Negro people in the Oklahoma City school district has been set by law for a period in excess of fifty years, and the residential pattern has much to do with the segregation of the races. To understand the situation more clearly, it must be pointed out that the east and southeast portion of the original City of Oklahoma City was Negro, and all other sections and districts of the City of Oklahoma City were occupied by the white race. Thus the schools for Negroes have been centrally located in the Negro section of Oklahoma City, comprising generally the central east section of the City. Following (the cases of *Brown I* and *Brown II*) the Oklahoma School Board for the first time was confronted with the duty of desegregating the segregated policy of law, of custom and tradition for a period of fifty years."

and to strike down the Board's then existing policy of "minority-to-majority" transfer which was perpetuating school racial segregation. *Dowell I,* at 442.[21]

---

19. In *Goss* at 686, 83 S.Ct. at 1408, the Court remarked: "It is readily apparent that the transfer system proposed lends itself to perpetuation of segregation. Indeed, the provisions can work only toward that end. * * *"; and at 689, 83 S.Ct. at 1409, continued: "In reaching this result we are not unmindful of the deep-rooted problems involved. Indeed, it was consideration for the multifarious local difficulties and 'variety of obstacles' which might arise in this transition that led this Court eight years ago to frame its mandate in *Brown* in such language as 'good faith compliance at the earliest practicable date' and 'all deliberate speed'. * * * The transfer provisions here cannot be deemed to be reasonably designed to meet legitimate local problems, and therefore do not meet the requirements of *Brown.* * * *"

20. In *Dowell I,* at 433 this Court stated: "The foregoing Oklahoma Constitutional provision and statutory provisions are unconstitutional, null and void, and are unenforceable. (citing *Brown I*). And such laws shall not be used in the future in any degree to form the basis of any school policy or operation, nor shall the custom and tradition created out of the use of these unconstitutional laws form the basis of any policy or the operations of the defendant school system."

21. The Oklahoma City condition must be sharply distinguished from Bell v. School City of Gary, Indiana, 324 F.2d 209 (CA 7, 1963) wherein the Court held that there was no affirmative constitutional duty to change innocently arrived at school attendance districts caused by shifts in population which increased or

In September, 1965, this Court learned from the submitted evidence that the Oklahoma City School Board had failed to desegregate public schools eliminating tangible elements of the segregated system and violation of the constitutional rights of the Negro pupils. Read Dowell v. School Board of Oklahoma City Public Schools, 244 F.Supp. 971 (D.C. W.D.Okl., 1965). As observed by this Court in *Dowell II*, at 977:

" * * * inflexible adherence to the neighborhood school policy in making initial assignments serves to maintain and extend school segregation by extending areas of all Negro housing, destroying in the process already integrated neighborhoods and thereby increasing the number of segregated schools.

 \* \* \* \* \* \*

The existence of segregated residential patterns makes necessary, at the very least, a transfer policy which enables pupils to transfer to schools outside the school of their residence where the majority of pupils are of a different race or color." [22]

## Later Decisions

In November, 1965, the Supreme Court specifically ruled that faculty allocation was relevant to the adequacy of the desegregation plan, and the Court pointedly noted that "more than a decade has passed since we directed desegregation of public school facilities." Bradley v. School Board of City of Richmond, 382 U.S. 103, 105, 86 S.Ct. 224, 225–226, 15 L.Ed.2d 187 (1965).[23]

In 1968 the High Court, in construing a Virginia "freedom-of-choice" plan where about one half of the county's population were Negroes and where during the plan's three years of operation, no white student had chosen to attend the all Negro school and where 85 percent of the Negro students in the system still attended the all Negro school, held that the School Board has the burden to provide a plan that promises realistically to work *now*, and a plan which at this late date fails to provide meaningful assurance of prompt, effective disestablishment of a dual system is intolerable. Green v. County School Board of New Kent County, (Virginia), 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716.[24] The

decreased the percentage of Negro or white pupils. Significantly, in *Bell* there was no history of forced residential segregation of races by law so a policy requiring students to attend the school designated to serve the geographic district in which they lived had neither overtone nor tinge of racial discrimination.

22. This Court also observed: "For the same reasons, it is imminently desirable that all faculty personnel be employed, assigned, and promoted with regard to both their quality of preparation and performance and in a manner so as to insure that each school, whether located in a segregated residential area or not, shall have a faculty representative of all racial groups in the total community.
 \* \* \* \* \*
Continuing racial discrimination in housing and in economic opportunities, combined with still viable public adherence to the standards or a segregated society, render impossible meaningful school desegregation unless vigorous, affirmative measures are undertaken by the School

Board. Such changes must be instituted with full regard rather than disregard of race." (pp. 977–978)

23. "The goal of faculty integration is not the allocation of teachers on either a token or a quota basis. The pattern of faculty assignment should be designed to avoid identification of any particular school as predominantly Negro or white. The evidence discloses the difficulty of reaching this goal, but it does not establish that attainment is impossible. * * * " Brewer v. School Board of City of Norfolk, 397 F.2d 37, 39 (CA 4, 1968). Accord, United States v. Montgomery County Board of Education (Alabama), 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

24. Accord, Felder v. Harnett County Board of Education (North Carolina), 409 F.2d 1070 (CA 4, 1969); Board of Public Instruction of Duval County, Florida v. Braxton, 402 F.2d 900, 906 (CA 5, 1968): "There is no merit to the Board's argument that race may not be taken into account for purposes of transferring stu-

Court at 441–442, 88 S.Ct. at 1696, stated:

" * * * in other words, the school system remains a dual system. Rather than further the dismantling of the dual system, the plan has operated simply to burden children and their parents with a responsibility which *Brown II* placed squarely on the School Board. The Board must be required to formulate a new plan and, in light of other courses which appear open to the Board, such as zoning, fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools."

Interestingly, in *Green*, supra, at 442, footnote 6, the Court although not dealing with a problem of residential segregation, as in the case at bar, significantly observed:

"In view of the situation found in New Kent County, where there is no residential segregation, the elimination of the dual school system and the establishment of a 'unitary, non-racial system' could be readily achieved with a minimum of administrative difficulty by means of geographic zoning —simply by assigning students living in the eastern half of the county to the New Kent School and those living in the western half of the county to the Watkins School. *Although a geographical formula is not universally appropriate,* it is evident that here the Board, by separately busing Negro children across the entire county to the 'Negro' school, and the white

children to the 'white' school, is deliberately maintaining a segregated system which would vanish with non-racial geographic zoning. The conditions in this county present a classical case for this expedient." (Emphasis added)

In two other cases considered by the Supreme Court at the same term it considered *Green*, plans based upon geographic or natural boundary attendance zones, coupled with "free-transfer" provisions were struck down where the operations thereof left identifiable dual systems, Monroe v. Board of Commissioners (Mississippi), 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968);[25] Raney v. Board of Education (Arkansas), 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968). And the Court concluded in *Monroe*, 391 U.S. at 459–460, 88 S.Ct. at 1705:

" * * * the Board 'must be required to formulate a new plan and, in light of other courses which appear open to the Board, * * * fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools.' "

### Latest Decisions

In Keyes v. School District No. 1, (Colorado) 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed. 37, 38 (Aug. 29, 1969), Justice Brennan vacated a Tenth Circuit Court of Appeals Order and reinstated the District Court's Order requiring partial implementation of a Denver desegregation school plan having been prepared

---

dents. In some situations, there is no way of undoing the effects of past discrimination except by taking race into account. * * * " Cf. Wanner v. County School Board of Arlington County, Virginia, 357 F.2d 452, 455 (CA 4, 1966): " * * * Courts will not say in one breath that public school systems may not practice segregation, and in the next that they may do nothing to eliminate it."

25. In *Monroe* at 459, 88 S.Ct. at 1705, the Court emphasized: " * * * Respondent's argument in this Court reveals

its purpose. We are frankly told in the Brief that without the transfer option *it is apprehended that white students will flee the system altogether. 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.' Brown II*, 349 U.S. at 300, 75 S.Ct., at 756." (Emphasis added). Cf. Walker v. County School Board of Brunswick County, Virginia, 413 F.2d 53, 54 (CA 4, 1969).

by the School Board but later rescinded after Board membership changes following an election. As observed by Justice Brennan, 396 U.S. at 1216, 90 S.Ct. at 13, 24 L.Ed.2d at 39:

> " * * * But the reasons given by the Court of Appeals for striking the balance in favor of the stay clearly supplied no support in law for its action. It was not correct to justify the stay on the ground that constitutional principles demanded only 'that desegregation be accomplished with all convenient speed.' 'The time for mere "deliberate speed" has run out. * * * ' Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). 'The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.' (citing authorities) * * *."

On October 29, 1969, the Supreme Court reversed the Fourth Circuit, Court of Appeals for suspending an earlier District Court Order requiring submission of desegregation plans for 33 Mississippi School Districts during the coming year upon the Motion of the Department of Justice and recommendation of the Secretary of Health, Education and Welfare upon the premise that the time was too short to accomplish a complete and orderly implementation of the desegregation plans for the coming school year. The High Court directed the entry of an Order, effective immediately, declaring that each of the school districts involved could no longer operate a dual school system based on race or color, and directing that the school districts begin immediately to operate as unitary school systems. Alexander v.

Holmes County School Board (Mississippi) 396 U.S. 19, 90 S.Ct. 29, 24 L. Ed.2d 19 (1969).[26]

### The Case at Bar

On December 15, 1969, the Supreme Court in a *per curiam* opinion held that this Court appropriately entered its August 13, 1969, Order approving the Oklahoma City Board's proposal for furthering desegregation by revising school attendance boundaries effective September 2, 1969, and also decreeing that the School Board prepare and submit on or before November 1, 1969, a comprehensive plan for the complete desegregation of the entire school system. Dowell v. Board of Education of the Oklahoma City Public Schools, 396 U.S. 269, 90 S.Ct. 415, 24 L.Ed.2d 414. In so holding the Court stated:

> " * * * The Court of Appeals erred in holding that the District Court's approval of the School Board's plan must be vacated because consideration of the proposal was inappropriate except in the context of a comprehensive city-wide plan. The burden on a school board is to desegregate an unconstitutional dual system at once. (citing authorities) * * *"

### CONCLUSIONS

#### Intervenors

 1. The Baker group's Motion to Intervene filed December 3, 1969, is not timely. Compare Janousek v. Wells, 303 F.2d 118, 122 (CA 8, 1962); Slusarski v. United States Lines Company, 28 F.R.D. 388 (D.C.E.D. Pa., 1961). Moreover, movants' exact interest is adequately represented by other persons, long-time parties to this litigation.[27]

26. In *Alexander* at 19, 90 S.Ct. at 29 the Court specifically observed: " * * * The Court of Appeals should have denied all motions for additional time because continued operation of segregated schools under a standard of allowing 'all deliberate speed' for desegregation is no longer constitutionally permissible. Under explicit holdings of this Court the obligation of every school district is to ter-

minate dual school systems at once and to operate now and hereafter only unitary schools (citing authorities)."

27. The thrust of intervenors' complaint is that the Cluster Plan under consideration purposes "to obtain a preconceived and predetermined racial balance. * * * The result is to discriminate on the basis of race in that school boundaries have

See Rule 24, Federal Rules of Civil Procedure; read Kozak v. Wells, 278 F.2d 104, 108, 84 A.L.R.2d 1400 (CA 8, 1960).

### The Plan

2. Since 1954, the law has moved from the posture barring discrimination to the positive role demanding immediate abolition of any racially dual educational system.

3. The Board did not originate patterns of residential racial segregation but it must create and maintain a unitary educational system.

4. The comprehensive plan for desegregation of junior and senior high schools of the Oklahoma City Public Schools, adopted by the Board on November 5, 1969, and filed herein November 6, 1969, as supplemented (which supplement was filed herein January 12, 1970) was developed in good faith, is meaningful and is feasible; it promises to work realistically, and to work *now*.

5. The comprehensive plan will result in the operation of a unitary school system; it will leave no elements or traces of a racially dual system in the Oklahoma City secondary schools.

6. The Court will consider the plan dealing with the elementary schools, when the plan is filed pursuant to this Court's earlier order (read footnote 16, herein).

7. The decision in Alexander v. Holmes County School Board does not require the comprehensive plan to become effective during the 1969–1970 school year, inasmuch as there is presently in effect, pending appeals disposition, another plan for the 1969–1970 school year. Dowell v. Board of Education of the Oklahoma City Public Schools, 396 U.S. 269, 90 S.Ct. 415, 24 L.Ed.2d 414 (Dec. 15, 1969).

8. Neither the comprehensive plan nor this Court's Orders directing the plan preparation violate the Civil Rights Act of 1964.[28]

Accordingly it is hereby:

Adjudged, ordered and decreed:

1. All facts found in this and previous Orders, and all competent evidence including plans, reports, admissions and pleadings of record are relied upon to support this Order.

2. The Motion of intervenor Baker, et al. to intervene in this action is denied.

been drawn on the basis of race; bussing is required because of race and white students as well as black students are required to attend schools other than their normal neighborhood schools because of their race and are thus deprived of the 'equal protection of the law' as guaranteed by the Constitution of the United States" (Complaint in Intervention, p. 3, par. 1). Consider these remarks of District Judge McMillan: "When racial segregation was required by law, nobody evoked the neighborhood school theory to *permit* black children to attend white schools close to where they lived. The values of the theory somehow were not recognized before 1965. It was repudiated by the 1955 North Carolina General Assembly and still stands repudiated in the Pupil Assignment Act of 1955–56, which is quoted above. The neighborhood school theory has no standing to over-

ride the Constitution." Swann v. Charlotte-Mecklenburg Board of Education, 300 F.Supp. 1358, 1369 (D.C.W.D. N. Car., 1969).

28. Compare *Swann*, fn. 27, supra, 300 F. Supp. at 1373 where the Court ordered: "In formulating its plan the Board is, of course, free to use all of its own resources and any or all of the numerous methods which have been advanced, including pairing of grades and of schools; feeding elementary into junior high and into senior high; combinations of zone and free choice where each method proceeds logically towards eliminating segregation; and bussing or other transportation. The Board may also consider setting up larger consolidated school units freely crossing city-county lines to serve larger areas. There is no magic in existing school zone lines nor in the present size of any school."

3. The defendant Board of Education's Report for Comprehensive Plan to Complete Desegregation of senior and junior high schools of the Oklahoma City Public School System after 1969–1970 school year, filed herein November 6, 1969, and as supplemented January 12, 1970, is approved, and the defendant Board is directed to carry out the terms of such Comprehensive Plan, as supplemented and as approved.[29] Furthermore, no steps shall be taken which in any manner retreat from or modify steps thus far taken desegregating the Oklahoma City Public Schools.

4. The defendant Board is directed to file with the Court written reports by June 15, and October 15, 1970, detailing the treatment to be given the Dunjee and Kennedy schools, object of the Plan's supplement. This special order is made in view of the particular problem existing as to each of these two schools:

(a) *Dunjee.* This school, which serves students for grades 7 through 12, is 99.9 percent black and is located on the extreme eastern edge of this large school district (see Appendices 2 and 3). (The Court is advised that Dunjee was annexed to the Oklahoma City School District in 1965, under applicable Oklahoma statutes removing said school from the geographically adjacent Choctaw Independent School District.) [30] If for any reason the approved Plan as supplemented herein does not effect the desired unitary school condition, the Court upon appropriate motion and notice, will consider whether or not Dunjee pupils should be assigned to one or all of the adjacent schools of Choctaw, Jones and Star-Spencer.

(b) *Kennedy.* This junior high school at present is 99.8 percent black (see Appendix 3). It is located in John F. Kennedy Urban Renewal area. It is anticipated that in the immediate future, the racial residential complex of this attendance area will be dramatically changed by substantial white move-ins. Such a desegregation of this previously racially segregated black residential area will have a marked effect on the desegregation of Kennedy school.

Furthermore, this Court will remain available for future hearing and treatment of the Kennedy Junior High School matter, upon appropriate motion and notice by interested parties.

5. This order applies to all parties to this action, and specifically includes the present and future members of said Board and present and future Superintendents (and assistants) of the Oklahoma City Public Schools.

6. Jurisdiction is retained for all further appropriate orders (including consideration of the elementary schools' plan, when filed).

29. The spirit of this Order contemplates that the Board (within the approved Plan's framework) continually implement and improve upon the Plan's operational details, so as to create and maintain a perfectly integrated, unitary school system.

30. Specifically, Dunjee was annexed from Independent School District No. 4 of Oklahoma County (Choctaw) in two parcels: (1) The first annexation took place by the County Superintendent's order of annexation of June 9, 1965, based upon an election of June 8, 1965, wherein 333 of 343 votes cast favored annexation; (2) The County Superintendent ordered a subsequent annexation on August 26, 1965, based upon the election of August 24, 1965, wherein 58 of 65 votes cast favored annexation. No appeal was ever taken from either order entered by the County Superintendent. Read 70 Okla. Stat. § 7-1(a)-(d).

APPENDIX 1

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

ROBERT L. DOWELL, an Infant who sues by A. L. DOWELL, his Father and Next Friend,

Plaintiff,

-vs-

THE BOARD OF EDUCATION OF THE OKLAHOMA CITY PUBLIC SCHOOLS, et al,

Defendants.

No. 9452 – Civil

## REPORT OF DEFENDANTS OF COMPREHENSIVE PLAN FOR COMPLETE DESEGREGATION OF SENIOR AND JUNIOR HIGHSCHOOLS OF THE OKLAHOMA CITY PUBLIC SCHOOL SYSTEM AFTER 1969–70 SCHOOL YEAR

The Defendants hereby report that, as directed by the Court in its Orders of August 13, 1969, September 11, 1969, and October 29, 1969, a full, comprehensive plan for the complete desegregation of the senior and junior highschools of the Oklahoma City Public School System after the 1969–70 school year has been adopted by the Board of Education of the Oklahoma City Public Schools, which plan is attached hereto as Exhibit A hereof.

(s) J. Harry Johnson
2105 First National Building
Oklahoma City, Oklahoma
73102
ATTORNEY FOR DEFENDANTS

———◆———

Exhibit A

COMPREHENSIVE PLAN FOR COMPLETE DESEGREGATION OF JUNIOR AND SENIOR HIGH SCHOOLS OF THE OKLAHOMA CITY PUBLIC SCHOOLS

(Adopted by Board of Education, November 5, 1969)

INTRODUCTION

The primary objectives of the Oklahoma City Public Schools is to provide a quality education for each student and that objective is shared by the patrons of this district. The plan submitted for the consideration of the Court reflects the commitment to that goal and to another one: that of providing for meaningful interaction between minority and majority groups. The depth and extent of the interaction, occurring in the context of a unity of purpose, makes true integration a vital and fundamental part of the whole school structure.

At present, the Oklahoma City Public Schools serve a community which, like much of the nation, is in a state of crisis. A portion of that crisis revolves around the twin issues of segregation and discrimination. These are historical problems and, as they were not created by any one institution, neither can they be solved by any one institution.

Housing patterns, developed over a long period of time and resulting from a variety of causes, have led to *de facto* segregation, a condition which affects the schools but is not subject to either the direct control or the indirect influence of the Board of Education.

The Board does, however, recognize and welcome its responsibility for finding the solution to that part of the problem which falls within its domain and for making constructive efforts toward bringing about change in other areas. It is agreed that this plan represents a major and positive step toward these goals and the Board is pledged to encourage other agencies of government to take similar action on aspects of the problem as it relates to children within their spheres of influence and to give full cooperation and support in connection with such action.

The Board recognizes, too, that any plan must have the support of the community if it is to succeed. The climate of crisis has tended to complicate the school situation by polarizing the attitudes of groups within the community. Sincere and honestly concerned patrons, representing all points along the spectrum of public opinion, have become fearful that their freedom of choice in both school and home selection will be compromised or that the quality of educational opportunity available to their children may be lowered.

This plan, accepted unanimously by the Board of Education, answers those fears and offers assurance to the citizens of this community that the goals of quality education and social justice can be met simultaneously, that they are, in fact, inseparable. It is a plan which can unite the community and move it forward toward lasting gains in other areas of concern.

This plan makes possible a school situation in which desegregation and integration can be defined operationally and demonstrated successfully: desegregation as the physical mixing of the races and integration as the experience of acceptance for all students and equal educational opportunities according to their individual interests and abilities. Neither of these is accomplished instantaneously; both involve a continuous process.

. The plans of a number of school systems for achieving desegregation and integration have been carefully examined by this Board, as have the many suggestions presented by community groups and individuals. It is the consensus of the Board that no completely successful model exists. Just as each community is unique, so must its plan be unique. The plan developed for Oklahoma City includes elements of several different organizational concepts, adapted specifically to meet the needs of this community and further adaptable as a model for other districts.

In addition to what is presently being done, this plan will accomplish the following:

1. Increase the educational opportunities and options available to pupils in all schools.

2. Reduce the concentration of minority racial groups in certain schools and provide for meaningful interaction among students of all racial, social, and cultural backgrounds.

3. Provide immediately for whites in high schools that were previously either predominantly black or all black, and for blacks in high schools that were previously predominantly white or all white.

4. Eliminate within a period of three years the identification of any secondary school as black or white.

5. Increase inservice education to provide for human relations training for pupils, staff, and patrons of the school district.

The task set by the Oklahoma City Board of Education for itself was to devise a plan that would meet with the Court's approval, unite the various groups within the district in support of it, and upgrade both the quality and quantity of educational opportunity available to all students. It is the deeply felt conviction of all members of the Board that this plan represents the accomplishment of that task and it is in this spirit that the plan is presented.

## PROCEDURE FOLLOWED IN DE-VELOPING THE PLAN

At an official meeting on September 17, 1969, the Board of Education of the Oklahoma City Public Schools directed the Superintendent to designate a staff member to devote full time to developing a long-range, comprehensive desegregation plan for the secondary schools. That person was also to serve as a liaison between the Board and the various agencies, organizations, and interested individuals of the community. Dr. Tom Smith, Assistant Superintendent, was appointed to assume this responsibility.

Within the first two weeks, Dr. Smith established contact with more than 104 individuals, agencies, and organizations in this area, as well as some outside groups which might be of assistance. A list of those contacted is attached. (See Appendix I.) The ideas and suggestions received were summarized and presented to the Board by Dr. Smith at the Board's September 25 meeting and at four subsequent meetings. Complete copies of all materials received were distributed to the Board and Dr. Lillard, the Superintendent. Copies were supplied also to the Consultative Center for School Desegregation at the University of Oklahoma and numerous conferences were held with its staff.

Dr. Max Wolff, Director of the Educational Parks Project, Center for Urban Education in New York City, was invited to Oklahoma City and his expenses paid by the Board of Education. At an October 24 meeting, Dr. Wolff explored with members of the administrative staff and the Board the possibilities offered Oklahoma City by the Educational Park concept. On the following day, Dr. Wolff served as keynote speaker for an Educational Park workshop in which representatives of the Oklahoma City Public Schools and members of various civic and community groups, such as the Oklahoma City Chamber of Commerce, the Urban League, and the League of Women Voters, participated.

A team of professors from the Colleges of Education and Engineering at the University of Oklahoma submitted ideas and discussed them fully with members of the Board and the administrative staff.

Altogether, approximately 50 responses to the plea for ideas, suggestions, and guidelines were received. Among those submitting ideas and suggestions were: Americans for Quality Integrated Education, Neighborhood School Association, Oklahoma City Classroom Teacher Association, Oklahoma City Council of Parent Teacher Association, Oklahoma City Education Association, Oklahoma City Secondary Principals Association, Quality Education Action Group, and Urban League of Oklahoma City. A thorough analysis was made of all and those elements consistent with the goals and relevant to the particular situation of the Oklahoma City Public Schools were incorporated into the final plan.

## THE PLAN

For the past several years, the Oklahoma City Board of Education has been guided by two goals, that of providing a quality education for each child and that of effecting complete desegregation. To achieve both, without impairment of either, has required considerable research, deliberation, and, finally, new directions in planning, directions which utilized accepted educational principles

and are, at the same time, firmly rooted in human values.

Recent research projects have reinforced many of the traditional concepts in education and have pointed up some new ones. Traditionally, the schools have been charged with the responsibility for the development of an understanding of and appreciation for our common heritage in young people and with guiding them in achieving specified levels of scholastic knowledge and skills. In addition, both educators and parents have become increasingly aware of the importance of providing young people with the opportunity for more creative involvement in the educational process and for the pursuit of individual academic and career interests.

But the school is not merely an academic storehouse; it is also a social environment in which young people must be helped to flourish and grow in several dimensions. A quality education, then, must aid in the development of a strong feeling of personal worth and an appreciation of the worth and dignity of others and of those skills which will better equip them to live in a world of reality. Above all, the school must play a positive role in the evolution of physically, emotionally, and socially fit citizens. Toward that end, all students must have the experience of functioning in a multi-ethnic situation similar to that of the larger society while, at the same time, each is offered an equal opportunity for individual growth and development.

The implementation of these objectives in a large urban area such as Oklahoma City presents many problems and their solution is dependent upon a new and innovative approach, upon the formulation of a dynamic new concept which will provide the framework for curriculum expansion, for more diversification in methodology, for the upgrading of instruction, and for responding to the needs of both students and community. This is the concept central to the plan presented by the Oklahoma City Board of Educa-

tion: instead of considering the schools as a collection of separated institutions, each serving a specified section and population, they must be viewed as one entity, a unified complex serving all students within the entire area. Through this plan, every student will be assured of the best of several organizational structures. He will have a neighborhood school with which he can identify and in which he can exercise the traditional pride; he will be able to participate in a variety of activities there. He will have a schedule designed to meet his specific needs and desires; he will have access to the wide range of facilities that only a large educational complex can offer; and he will have the advantage of association with fellow students from all sections and all groups of this community.

The basic plan combines elements of many different concepts: the neighborhood schools, the specialized centers, the educational park, and modular scheduling; in addition, it provides for maximum utilization of both facilities and personnel.

Under this plan, each secondary school will serve in a dual capacity. It will be a home-base school for students within its attendance area and will serve as a specialized center for a specified curricular area. For example, one school could serve as a Social Studies Center, another as a Science Center, another as a Math Center. Each school, in its role as home-base, will offer some elective courses and such activities as physical education, athletics, and music to its resident students; in its role as a specialized Center, it will offer a full range of courses in that curriculum area to students from several attendance areas, including its own.

To minimize the problems of access and transportation, the high schools will be divided into two clusters. Cluster A will comprise Capitol Hill, Douglass, Grant, and Southeast High Schools; Cluster B, Classen, Marshall, Northeast, Northwest Classen, Dunjee, and Star-Spencer.

Within each cluster, individual schools will serve as home-base schools for students in their own attendance areas and as specialized schools for students from all schools within that cluster. The two exceptions will be Dunjee and Star-Spencer which, because of their removed location, will serve only as home-base schools. This division into two clusters simplifies the logistics of the arrangement and also offers a healthy balance in each cluster of racial, cultural, and economic groups.

At the outset, if the Order of August 13, 1969, in Civil 9452 of the United States District Court for the Western District of Oklahoma, approving the plan for further desegregation in the 1969–70 school year, remains in effect and is not vacated or modified by the United States Court of Appeals or the Supreme Court of the United States, then the attendance areas fixed by that plan for Harding and Northeast will be the attendance areas for these schools. If, however, the August 13, 1969, Order is vacated, then the attendance areas of Harding and Northeast will be the same as those which were in effect for those two schools at the end of the 1968–69 school year.

Students will spend varying amounts of time each week in each of the Centers, though not less than half the school day at any one Center. The exact amount will be determined on the basis of each student's needs and requirements. Modular scheduling, a tested and accepted means for meeting individual needs through class periods of varying lengths and different methodologies, will add an extra dimension of flexibility. The student whose primary area of interest is the same as that of his home-base school's specialization will spend the major portion of his time there; others may spend only a limited period each day at the home-base, the rest at various other Centers.

The general structure of this plan will ensure a positive and constructive desegregation, regardless of the wide variation in individual scheduling. Even that student who spends most of his time in his home-base school will be exposed on a regular basis to students from all ethnic groups in the specialized courses offered there. The pattern of moving students from one attendance area to another will offer each the widest possible association within his peer group. Equally important, this association will serve the purpose of improving the academic program for all students and will facilitate efforts to establish a uniform grade level structure for all secondary schools in the Oklahoma City Public Schools. Active recruitment of voluntary majority to minority transfers throughout the system at all grade levels will continue and will be the policy at the home-base schools also.

The advantages arising from the conversion of each school into a specialized Center are manifold. The concentration of equipment and resources relating to a particular content area in one building in each cluster will make them more readily available to all students and will make possible the acquisition of a larger variety of such materials by eliminating the necessity for providing the same facilities in all schools. As an example, the Science Centers will house all of the laboratory facilities, materials, and libraries relating to the courses taught there, thus facilitating their use by faculty and students.

The location of teachers of a particular discipline in one building will also lead to an improvement in the total educational process. The contribution and example provided by the best teachers will, through interaction, raise the standard for all teaching. The upgrading of personnel through inservice workshops and training will be continued and will be more easily accomplished. Subject-are consultants who now divide their time among many schools will be housed in the various Centers and will be able then to offer instructional leadership on a full-time basis. Administrators,

relieved of the necessity for providing leadership in all subject areas, will be able to concentrate their efforts on tasks relevant to their roles, thus ensuring a more efficient operation. The integration of certificated staff members will continue; however, in those home-base schools where the student body is predominantly of one race, the certificated staff will be predominantly of the same race.

A third area in which advantages will accrue through utilization of specialized Centers is curriculum. At present, there are many courses which cannot be offered at all schools because of limited demand, a shortage of teaching personnel, or a lack of facilities. Through the concentration of all three of these elements, an expansion of the present curriculum can be readily effected. Programs, designed for both slow and accelerated students will be more easily instituted in this setting, as will special compensatory programs for students with academically deficient backgrounds and advanced courses for students with particular interests. Special attention will be devoted to upgrading all facets of the program, including the physical facilities, in culturally deprived areas. A strong, fairly administered discipline policy will be in force in all schools.

On the junior high level, several changes will be required to achieve the desired ethnic balance in all schools. Effective with the 1970–71 school year, Moon Junior High School will be closed and pupils residing in its attendance area will be assigned to Central, Capitol Hill, Jackson, Jefferson, Roosevelt, and Webster Junior High Schools. Since the Moon student body is presently 99% black and the other mentioned schools are predominantly white, this action will bring about a desirable racial balance in all six schools. To achieve a similar balance at Hoover Junior High School, now primarily white, the seventh grade students residing in the Longfellow area will be assigned there. These students, predominantly black, are now attending Eisenhower which has become seriously overcrowded.

Some modification of existing facilities will be necessary for the effective implementation of this plan but, at present, it seems unlikely that any additional facilities will be required.

Since this program does, however, necessitate a complete redesign and reorganization of the operational structure of the Oklahoma City Public Schools, a period of intensive and extensive planning is essential to its success. There are several fields which will be included in that planning.

One such field might be termed school-community relations. Several proposals for introducing the new program to the public in an affirmative way are already under consideration. The majority of these proposals involves the use of the school-owned radio and television facilities as well as commercial outlets. Teachers will be thoroughly acquainted with the advantages as well as the mechanics of the plan through professional meetings, in addition to the public media and will assist in the briefing of students. A speaker's bureau, already organized, will be used to bring the plan to the citizens through talks with school allied, community, and civic groups. Emphasis will be given to both the educational and human values inherent in the plan and a positive effort will be made to secure support for and commitment to the plan by all groups within this school district, as well as educational leaders and interested citizens from outside the school district.

The cooperation of such groups as the Oklahoma City Real Estate Board, the Chambers of Commerce, churches, and the many civic clubs will be actively sought and they, as well as individual citizens, will be encouraged to foster the idea of total integration and to work toward its actualization. Since open housing would seem to provide the ultimate answer to this social problem, it will be vigorously supported by all pos-

sible means. The enlargement of the Board of Education to include a minimum of seven members would give all segments of the community representation to that body and legislation to effect that end will be advocated.

Another field which will receive comprehensive treatment during the planning period is that of logistics: the moving of equipment, the assignment of faculty, and the scheduling and transportation of students.

The complexity of this particular problem will require the use of a computer-stored information and retrieval system and systems analysis, both during the planning and later, when the plan is effected.

In order to monitor the project, a list of activities necessary to the completion of the project will be compiled. The time required to complete the activity will be estimated and those persons, both staff and consultants, responsible for activity will be identified. Monthly reports and information summaries will be produced for the benefit of the court, the school board, the administrative staff, and the public through news media.

During the initial phases of the planning period, a research model will be constructed, utilizing relevant data such as detailed information on facilities, faculty, curriculum, and students. The model will be used to adapt and modify the modular scheduling program, to add a routing plan to the transportation program and integrate that program with scheduling, to monitor cost-effectiveness information, to train personnel in using the model, and to document the program. Repeated testing of the model by runs through the computer system will point up discrepancies and conflicts and enable the research team to refine the model and produce a final schedule of teaching assignments, facility utilization, student schedules, and transportation routing and utilization.

During the planning process, experienced, qualified consultants will be used to work with and train school personnel in the use of computer programming and output and in making the most effective use of the complex data provided. Teachers and students will be instructed in the ways in which the new system can be utilized for maximum benefit. It is possible that the model developed by the operations research team can be used to provide simulations for training purposes.

A cost/benefit analysis will be prepared and will provide the bases for decision-making by furnishing information on transportation costs using a variety of plans: the cost of remodeling and expanding school Centers and adding the new equipment that would make possible the expansion of curriculum; the cost of administrative changes; and the cost of computer programming, time, and monitoring. Such information will ensure a realistic approach to the new program.

Throughout the planning period, consultants of outstanding qualifications will be used to advise and assist in the areas of their special competencies.

The full program, developed, tested, and refined during the planning period, will go into operation at the beginning of the fall term, 1970. In the interim, the planning process will be monitored, monthly reports on its progress will be issued, and the full support of the community will be sought, so that in the fall of 1970, when the full program is initiated, the Oklahoma City Public Schools will have made historic strides toward the achievement of the two goals most important to them: genuine equality of educational opportunity through the availability of a quality education to every student and complete, literal, and actual desegregation.

During 1970–71, a continuing evaluation will be made. If necessary, further modifications in the program will be made in order to improve the educational program and to make even greater progress toward the ultimate goal of complete and total integration.

APPENDIX 2

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

ROBERT L. DOWELL, an infant, who
sues by A. L. DOWELL, his father and
next friend, et al.

 Plaintiffs,

 -vs- No. 9452–Civil

BOARD OF EDUCATION OF THE
OKLAHOMA CITY PUBLIC SCHOOLS,
et al.

 Defendants.

REPORT OF ADOPTION OF SUPPLEMENT TO COMPRE-
HENSIVE PLAN FOR COMPLETE DESEGREGATION OF
THE JUNIOR AND SENIOR HIGH SCHOOLS OF THE
OKLAHOMA CITY PUBLIC SCHOOLS AFTER THE
1969–70 SCHOOL YEAR

Submitted herewith, for approval of the Court, is a Supplement to
the Comprehensive Plan for Complete Desegregation of the Junior
and Senior High Schools of the Oklahoma City Public Schools after
the 1969–70 school year, which Plan was adopted by the Board of Edu-
cation of the Oklahoma City Public Schools on November 5, 1969, and
filed herein on November 6, 1969.

The Supplement, attached hereto as Exhibit A hereof, was adopted
by the Board of Education of the Oklahoma City Public Schools on
January 6, 1970.

 (s) J. Harry Johnson
 Attorney for Defendants

EXHIBIT A

SUPPLEMENT TO COMPREHENSIVE PLAN FOR COMPLETE
DESEGREGATION OF
JUNIOR AND SENIOR HIGH SCHOOLS OF THE
OKLAHOMA CITY PUBLIC SCHOOLS

(Adopted by Board of Education, January 6, 1970)

Since the presentation of the comprehensive plan for the desegre-
gation of junior and senior high schools in the Oklahoma City Public
School System, it has been possible to formulate a number of addition-
al plans and complementary activities which, when incorporated into
the total plan, will further the goal of greater interaction among stu-
dents of all races and thus provide the opportunity for real and mean-
ingful integration of schools within the system.

In addition, consideration has been given to additional steps to be
taken to further disestablish Dunjee and Kennedy Schools as identifia-
ble black schools.

In the case of Dunjee, the physical distance from other secondary
schools in the system compounds the difficulty involved in including it
in the comprehensive plan. With the implementation, however, of the
additional activities as described in this supplement, interaction of the
races will be a reality.

In the case of Kennedy, the present situation is expected to be temporary because much of the Kennedy attendance area is affected by the activities of Urban Renewal and several low income housing complexes are planned for that area; some are even now under construction. If the projections of the Urban Renewal Authorities prove correct and a sizeable proportion of whites occupy the new housing units, Kennedy Junior High School will be thoroughly integrated as a result.

In the interim, however, the Board of Education plans to initiate a number of academic and other activities in which Kennedy and all junior high school students will participate on a regularly scheduled basis and through which interaction of all races and ethnic groups can be accomplished. These activities will be continued after racial integration itself has been achieved so that students from all income, ethnic, and social groups in Oklahoma City will have the opportunity to discover and develop respect for their likenesses as well as their differences.

These same results are expected to proceed from the many and varied activities provided for in the Cluster Plan. These activities will have many different forms; among them, special interest groups, athletic programs, and academic organizations.

Within the Specialized Centers, student groups such as science and math clubs will be formed to give students within the cluster a less formal, though still structured, setting for interaction and wider acquaintance. Field trips centered around an academic discipline will be organized within the Specialized Centers as a means for students to share experiences. Those field trips planned around home-base school activities will be coordinated so that two or more high schools will be involved.

While music activities will be a part of the home-base schools, and each school will have its own choral groups, instrumental groups, and bands, multiple opportunities will be provided for sharing those activities. Interschool choral and instrumental groups will be established and assembly programs will be presented, using these groups as well as groups from two or more schools.

To further the understanding and respect generated by such activities, other assemblies and programs, in the form of exchange panels and presentations, will be planned for home-base schools within each cluster. To provide a similar exchange of ideas and feelings on a more individual level, interschool clubs, such as human relations clubs, will be provided for within the individual school structure to serve a definite purpose.

In all school sponsored or approved organizations for students, a general policy will be followed of encouraging the active participation of students of all races, both as members and as officers of each group. Existing regulations governing eligibility for office in student clubs will be revised and brought into agreement with the standards of the Oklahoma Secondary School Activities Association.

The present athletic program will be expanded to include a strong, active intramural program for all schools within each cluster, providing yet another area for interaction. Halftime entertainment at competitive athletic events will, as a matter of policy, be presented by students from both participating schools.

The total integration of the coaching staffs for major athletics in each school will be a matter of highest priority. Serious efforts will be made to assign and/or recruit personnel so that at least one of the top assistant coaches in each major sport will be of a race other than that of the head coach.

Where the home-base school does not provide facilities for a minor sports activity, students with a specific interest in that sport will be allowed to transfer to another home-base school within the Cluster.

As in the comprehensive plan, each of these activities will be subjected to a continuing evaluation and refinement. In the event that any of them do not contribute toward the desired goal of desegregation, it will be revised or replaced by another activity. It is hoped that new and even more effective plans will suggest themselves out of our experience in implementing and evaluating the plan. The Board of Education and the Administrative staff of the Oklahoma City Public Schools are committed to the complete desegregation of this school system and to provide the personnel, the facilities, and the plans to bring about that goal.

[A1126]

APPENDIX 3

AN EXTRACT FROM PLF'S EXH. 2, P. 4, A STATISTICAL
CHART SHOWING "PUPIL MEMBERSHIP BY GRADE
AND RACE" AS OF DECEMBER 5, 1969 SHOWS THE DIS-
TRICT'S SECONDARY ENROLLMENT AS TO NEGRO,
OTHER, TOTAL AND NEGRO PERCENT OF ENROLL-
MENT AS FOLLOWS:

| SCHOOL .... | | N | TOTAL O | T | NEGRO % |
|---|---|---|---|---|---|
| Rogers (6th–9th) | ... | 233 | 841 | 1074 | 21.7 |
| Capitol Hill Jr. | ... | 36 | 949 | 985 | 3.7 |
| Central | ... | 77 | 839 | 916 | 8.4 |
| Eisenhower | ... | 304 | 724 | 1028 | 29.6 |
| Harding | ... | 361 | 941 | 1302 | 27.7 |
| Hoover | ... | 7 | 1554 | 1561 | .5 |
| Jackson | ... | 11 | 1036 | 1047 | 1.1 |
| Jefferson | ... | 1 | 1595 | 1596 | .1 |
| Kennedy | ... | 1319 | 2 | 1321 | 99.8 |
| Moon | ... | 686 | 4 | 690 | 99.4 |
| Roosevelt | ... | | 1394 | 1394 | .0 |
| Taft | ... | 160 | 916 | 1076 | 14.9 |
| Webster | ... | 2 | 893 | 895 | .2 |
| Dunjee (7th–12th) | ... | 667 | 1 | 668 | 99.9 |
| Northwest Classen | ... | 301 | 2326 | 2627 | 11.5 |
| Southeast | ... | 4 | 1662 | 1666 | .2 |
| Star Spencer | ... | 248 | 942 | 1190 | 20.8 |
| Capitol Hill Sr. | ... | 29 | 2035 | 2064 | 1.4 |
| Classen | ... | 286 | 665 | 951 | 30.1 |
| Douglass | ... | 1359 | 6 | 1365 | 99.6 |
| Grant | ... | 1 | 2056 | 2057 | .1 |
| Marshall | ... | 33 | 2276 | 2309 | 1.4 |
| Northeast | ... | 429 | 603 | 1032 | 41.6 |
| Adult Day | ... | 169 | 214 | 383 | 44.1 |
| Carver | ... | 8 | 61 | 69 | 11.6 |
| Washington | ... | 40 | 25 | 65 | 61.5 |